### THE STATE OF TEXAS V. JUAN RODRIGUEZ SAIS ET AL.

1. WESTERN BOUNDARY OF TEXAS.—That part of Texas on the lower Rio Grande, and between it and the Nueces, was, by act of Congress of the Republic, December 19, 1836, declared a part of Texas. This, however, was under the actual jurisdiction of Tamaulipas, save Corpus Christi and parts along the Nueces, until annexation, December 29, 1845. The articles of annexation did not fix the boundaries. April 29, 1846, the Legislature of Texas reiterated the claim of Texas to the Rio Grande as its western boundary. The treaty of Guadalupe Hidalgo, February 2, 1848, between the United States and Mexico, established the Rio Grande as the boundary between the two nations, and the jurisdiction of Texas over this territory was acceded to by the " Compromise Act," on September 9, 1850, by act of Congress.

2. RIGHTS OF MEXICANS TO LAND.—By the treaty of Guadalupe Hidalgo, it was stipulated that the civil rights of Mexicans within the territory ceded to the United States, as they then existed under the laws of Mexico, should be protected by the United States.

3. RELIEF ACTS—MEXICAN TITLE—CONSTRUCTION OF STATUTE.—As one of several statutes, the act of August 15, 1870, was to ascertain what lands the State should recognize as justly belonging to individuals, whether the titles from the former government were perfect or imperfect, and to have them surveyed, mapped, and patented, but not to interfere with any superior rights that might have been acquired previous to the passage of the act.

4. SAME.—This act authorized the original grantee, heir, or assignee of any Spanish or Mexican grant having its origin previous to December 19, 1836, to land between the Rio Grande and Nueces rivers, and below a designated line, to file a petition to the District Court of Travis county, which should contain a full description of the land claimed and its boundaries, accompanied with the titles, or evidence of title, or right under which it is held. The District Court was required to investigate the same in accordance with the laws of nations, the laws, usages, and customs of the government from which the claim is derived, and the principles of equity applicable thereto, and to give judgment confirming the same when the title is perfect, or, if imperfect, when the same would have matured into a perfect title under the laws of such government, provided said title or right was founded in good faith.

5. SAME.—This act does not seek to defeat any title that can be maintained under the general laws of the State without the aid of the statute.

6. SAME.—To obtain the relief contemplated in the statute, a substantial compliance with the statute providing it is required.

7. TO OBTAIN such recognition of right provided by this statute, there must have been some part of the title perfected sufficient to establish the right of the claimant as a person entitled, and the land selected, with locality, boundaries, and extent identified, in such shape as that, if not a perfect title, it would be at least evidence of a right capable of being filed with the petition.

8. EVIDENCE.—The rules of evidence of the right to be established, must conform to the laws of the State as in other cases.

9. SUIT NOT NECESSARY TO TITLE.—A claimant may rely on the validity of his title under the laws of this State, including the treaty of Guadalupe Hidalgo, which is binding as a law, without availing himself of the benefits of suit under this act.

10. EXPEDIENTE—LOCATION—SURVEY, &c.—The decree No. 24 of the Congress of 19th October, 1833, granted lands on certain conditions to inhabitants of Camargo, Mier, &c.   The ayuntamientos of each jurisdiction were required to ascertain and certify to the qualification of applicants, which, when given to the interested party, authorized him under the laws and customs applicable to the acquisition of land, through the alcalde of his jurisdiction, to have the land selected and applied for, inspected, valued, and surveyed, after notifying adjoining proprietors.   The proceedings were all minutely put down in writing, including a plat of the survey, and recorded in the office of the alcalde, a duplicate of which was given to the party as a history of the initiatory proceedings of his title, and styled an expediente.

11. SAME.—The expediente was by the party interested transmitted to the Governor with money to pay for the land according to the valuation, and thereupon the Governor extended the title under the seal of the State, and directed the alcalde to put him in possession formally.

12. COMPLETE TITLE.—Possession being given, and the proceedings written out, recorded, and attached to the previous proceedings, constitute, in such case, a complete title.

13. PROTOCOL—TESTIMONIO.—The copy of all of these proceedings in the office of the alcalde, styled the protocol, corresponded with the copy certified and given to the interested party, styled the testimonio ; both are duplicate originals, evidencing the title to the land.

14. MEXICAN LAND GRANT.—These steps correspond with the Texas land system, and are analogous to the certificate, survey, and patent under the subsequent land laws of the State of Texas.

15. THE ABSENCE of the final act of possession and extension of complete title, the expediente having been forwarded to the Governor, and the money at which the land was valued having been paid, would not

affect the validity of a claim originating anterior to December 19, 1836.

16. EVIDENCE.—A copy of the expediente, certified to be correct by the alcalde succeeding, with assisting witnesses, the official signature of the alcalde and witnesses, being proven, and it being shown that he was authorized to give such copy, an examined copy of the same being also offered : *Held*, Sufficient evidence of the expediente.

17. JUDICIAL KNOWLEDGE.—It is the duty of the court to know and follow the law existing in any part of the present limits of the State at the time and under which a title to land was acquired.

18. CHANGE OF GOVERNMENTS.—Where one government succeeds another over the same territory, in which rights of real property have been acquired, the former government is not a foreign government, whose laws must be proved in the courts of the succeeding government.

APPEAL from Travis.   Tried below before the Hon. J. P. Richardson.

*George Clark, Attorney General,* and *Peeler & Fisher,* for appellant.

*James H. Bell,* and *Chandler, Carleton & Robertson,* for appellees.

ROBERTS, CHIEF JUSTICE.—That portion of Texas situated between the Rio Grande and Nueces river, south of a line drawn from the northern boundary of Webb county to the mouth of Moros creek, on the Nueces river, was originally a part of the State of Tamaulipas, in Mexico, whose capital was Victoria, some distance west of the Rio Grande.   That section of country was but sparsely settled, and was used principally for stock ranches, that had long been subject to frequent depredations from savage Indians.   On the 19th of December, 1836, an act of the Congress of Texas was passed, defining the boundaries of Texas, in which that territory was included.   Notwithstanding that, however, the State of Texas exercised no permanent jurisdiction over it, except along and near the Nueces river, including Corpus Christi, on the gulf; and the State of Tamaulipas exercised jurisdiction on and

near the Rio Grande, on the eastern side of it, until after the annexation of Texas to the United States, (on the 29th of December, 1845,) shortly after which, armed occupation of the disputed territory was taken by the United States, on behalf of Texas, since which time Texas has exercised jurisdiction over it. (Paschal's Dig., art. 438; Calkin *v.* Cocke, 14 How., 227; Lee *v.* King, 21 Tex., 582; Trevino *v.* Fernandez, 13 Tex., 663; Martin *v.* Weyman, 26 Tex., 465.)

By the "Articles of Annexation," consent was given by the United States, "that the territory properly included within and rightly belonging to the Republic of Texas may be erected into a new State, to be called the State of Texas," upon certain conditions and guarantees, one of which was that the State to be formed should be "subject to the adjustment by the Government of all questions of boundary that may arise with other governments." (March 1, 1845, Paschal's Dig., p. 44.) The assent of Texas to such terms was formally given in the convention, by an ordinance, on the 4th day of July, 1845. (Paschal's Dig., p. 45.) On the 29th of April, 1846, the Legislature of Texas adopted a joint resolution, declaring "that the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of Texas was acquired by the valor of the people thereof, and was by them vested in the Government of the Republic; that such exclusive right is now vested in, and belongs to, the State, excepting such jurisdiction as is vested in the United States by the Constitution of the United States and by the joint resolution of annexation, subject to such regulations and control as the Government thereof may deem expedient to adopt." (Paschal's Dig., art. 441.) On the 2d of February, 1848, the treaty of peace, of Guadalupe Hidalgo, between the United States and Mexico, was concluded, by which the Rio Grande was established as the line between the United States and Mexico, and thereby settling the boundary of Texas, in reference to this part of the country, as between Texas, in the United States, and Tamaulipas, in Mexico. As between Texas and

the United States, the right of Texas to the jurisdiction of Texas over the territory east of the Rio Grande, was definitely settled by the act of Congress, (called one of the compromise acts,) on the 9th of September, 1850, and acceded to by Texas on the 25th of November, 1850. (Paschal's Dig., art. 443.)  This had reference, however, particularly to the cession, by Texas to the United States, of that portion of New Mexico east of the Rio Grande.

By the treaty of Guadalupe Hidalgo, it was stipulated that the civil rights of Mexicans, within the territory ceded to the United States, as they then existed under the laws of Mexico, should be protected by the United States.  (U. S. Stats. at Large, vol. 9, pp. 929, 930.)

The inhabitants, and others owning lands by titles, perfect and imperfect, within the territory east of the lower part of the Rio Grande, not having had the same opportunities as persons in other parts of Texas, to have their titles established and recognized by the authorities of Texas, a law was passed for that purpose as early as 1850, and another in 1854, under which commissioners were appointed to investigate and report upon their titles, many of which were confirmed as valid by an act of the Legislature of 1852.  (Paschal's Dig., arts. 732–739.)

For the same object, another law was passed in 1860, authorizing suits to be brought against the State, in the counties there situated.  (Paschal's Dig., art. 739.)

The object of all of these laws, as therein expressed, was to ascertain what lands the State should recognize as justly belonging to individuals, whether the titles from the former government were perfect or imperfect, and to have them surveyed, mapped, and patented, but not to interfere with any superior rights that might have been acquired by third persons, previous to the passage of said laws.  (Paschal's Dig., arts. 4450, 4477, 4490.)  By the law in 1860, authorizing a suit to establish such right or title, it was provided that " all lands, the claims to which shall be finally rejected in the manner

herein provided, shall be deemed, held, and considered as part
of the public domain of the State." (Paschal's Dig., art.
4489.)

It is to be remarked, that neither in this, nor in any other
of the cases brought to this court in connection with it, was
there anything proved tending to show that this or any other
of such claims had been rejected in a suit, under said act of
the 11th of February, 1860.

For the same purpose and in similar terms, another act of
the Legislature was passed, on the 15th of August, 1870,
providing that " any person who may be the original grantee,
heir, or assignee of any grant of land, emanating from the Span-
ish or Mexican Governments, and having its origin previous
to the 19th day of December, A. D. 1836, and situated be-
tween the Nueces and Rio Grande rivers, and below a line
drawn from the northern line of Webb county to the mouth
of the Moros creek, emptying into the Nueces river, may file
a petition to the District Court of the county of Travis, or
where the capital of the State may be," * * which " shall
contain a full description of the land claimed, setting forth
particularly its situation, boundaries, and extent, and shall
accompany such petition with the titles, or evidences of titles,
or right under which the same is held or claimed, and the
said District Court shall investigate the same, in accordance
with the laws of nations, the laws, usages, and customs of the
Government from which the claim is derived, and the princi-
ples of equity, so far as the same are applicable, and shall give
judgment for the confirmation of the same, when the title is
perfect; or when imperfect, when the same would have ma-
tured into a perfect title, under the laws, usages, and customs
of the Government under which it originated, had its sover-
eignty over the same not passed to and been vested in the
Republic of Texas, provided said title or right was originally
founded in good faith." (Paschal's Dig., art. 7068.)

This suit, with a number of others now here on appeal,
varying somewhat in their facts, was brought under this act,

and it prescribes who may bring the suit, and what shall be required to maintain it. Like the other acts upon the same subject, it does not seek to defeat any title that can be maintained under the general laws of the State without the aid of this statute, but simply to confer upon the claimants the advantage of having such titles as are perfect recognized as such by the State, so far as the State itself is concerned, and to enable any one who had, in some legal mode, commenced to acquire a title from the former governments, and which once had a substantial inception, in good faith, attached to a particular tract of land, so as that its locality, boundaries, and extent could be described, previous to the 19th of December, 1836, conferring a right, under the laws there and then, and previously in force, to be perfected, and be, equally with the perfect titles, recognized by the State. A party applying to the court for such extra benefits, must substantially comply with the statute conferring the privilege. The fact that a person occupied a position, and had the necessary qualifications to have acquired land under the laws before that time, and had not, according to the laws and customs, applied for and selected a particular tract, with defined boundaries to identify it, does not confer such a right as is provided for by this statute. There must have been some part of the title perfected, sufficient to establish the right of the claimant as a person entitled, and the land selected, with locality, boundaries, and extent identified, in such shape as that, if not a perfect title, it would be at least evidence of a right, capable of being filed with the petition. In determining whether such a title or evidence of right has been presented for adjudication in any case, the court must look "to the laws, usages, and customs of the Government under which it originated." The rules of evidence, by which the muniments of title or evidences of right are established in court, must be conformable to the laws of this State, as in any other case. The only exception provided in the statutes on this subject relates to copies of papers "lost by the wreck of the steamer Anson,"

which, if it is still, in force, is not called into requisition in this or in any of the similar cases now here on appeal. (Paschal's Dig., art. 4463.) A claimant may rely upon the validity of his title under the laws of this State, including the treaty of Guadalupe Hidalgo, which is binding as a law, without availing himself of the benefits of a suit under this law.

The claim in this case originated under the decree No. 24 of the Congress of the State of Tamaulipas, of the 19th of October, 1833, which provided that, "to the inhabitants of Camargo, Mier, Guerrero, and Laredo, who may have no lands of their own, and who may possess stock to occupy them, there shall be given at once as much as five leagues each, and in recompense they shall pay to the State ten dollars for each league. Those only are comprehended in the foregoing article. who lived in said villages during the last Indian war, now passed, and who did not emigrate previous to the year 1821." This privilege was to continue three years, and the respective ayuntamientos of each jurisdiction were required to ascertain, by proof, and certify to the qualifications of applicants for lands under this decree, which, when given to the interested party, authorized him, under the laws and customs. applicable to the acquisition of lands, through the alcalde of his jurisdiction, to have the land that had been selected and applied for by him inspected, valued, and surveyed, after notifying the adjoining proprietors; the proceedings in all which were minutely put down in writing, including a plat of the survey, which, when written, was recorded in the office of the alcalde, a duplicate of which was given to the party, as a history of the initiatory proceedings of his title, (styled an expediente,) and which was by him transmitted to the Governor, with the money to pay for the same, according to the valuation, and upon which the Governor extended the title, under the seal of the State, and directed the alcalde of the jurisdiction in which the land was situated to put him in possession formally. This being done, and the proceedings thereof being written out, recorded, and attached to the pre-

vious proceedings, constituted, in such case, a complete title. The copy of all of these proceedings in the office of the alcalde, styled the protocol, corresponded with the copy certified and given to the interested party, styled the testimonio, and both were duplicate originals, evidencing the title to the land.

The most important parts of these proceedings were, 1st, the action of the ayuntamiento in establishing the right or qualification of the party under the law to get a grant of land; 2d, the survey of the land by the surveyor, under the directions of the alcalde; and 3d, the concession made by the Governor of the State, corresponding in the main to, 1st, the issuing of a headright certificate; 2d, the survey of the land, approved and recorded by the county surveyor; and 3d, the patent, issued from the General Land Office, under the Texas system of granting lands. The Texas system, though more simple and less ceremonious, was evidently founded on the Mexican, in its principal features.

The title in this case, filed with the petition, commencing with the application of Leonardo Vargas, of the town of Camargo, to the ayuntamiento, for three leagues of land, at the place called Guadalupe, under the decree No. 24 of 1833, contains their favorable action thereon on the 9th of September, 1834, and going through all of the details of the customary proceedings, contains an order entered by the Governor of Tamaulipas on the 23d day of March, 1836, for a title to issue, and a direction to the alcalde to put the interested party in possession, record the proceedings thereof, keeping a copy in his office, and return the expediente (meaning the historic record of the proceedings) to the records of the government, (at Victoria, the capital of the State.)

The act of putting the party in possession, and the final concession of the Governor, which he had ordered should be made, are not found in the title presented for adjudication and filed with the petition, and it is to that extent an imperfect title to the land claimed. It shows, however, the adju-

dicated right of the applicant, and the setting apart and survey of the land, with defined boundaries, and its locality and extent, and that the money at which it was valued under the law ($30) was paid into the treasury of the State, with the regularity and legality of the proceedings, and direction for their completion, by the attorney of the treasury, sanctioned by the order of the Governor.    Under these circumstances, · although the title is imperfect, "the principles of equity," contemplated by the State of 1870, authorizing this suit, may properly be invoked to relieve the applicant from again paying the price of the land, it having been paid into the treasury of the State of Tamaulipas at the proper time. (Paschal's Dig., art. 7068.)    This would seem to be proper, also, in consideration of the fact that this grant of land was made, partly at least, on the ground that the inhabitants of Camargo, and of other towns on the Rio Grande, named in the decree No. 24 of 1833, which constituted the frontier Mexican settlements of that region, had valiantly held their position against the hostile savages, which, as to those who needed lands there, caused the Government of the State to reduce the price from the ordinary minimum valuation of thirty to ten dollars per league.  Such reduction was doubtless intended as a partial remuneration for the losses sustained by the frequent and long-continued depredations of the Indians, that had kept them poor.   This branch of the subject, however, under the terms of the law, may address itself for determination more appropriately to other departments of the Government than to this court.

We have been referred to no law of limitations within which the party was required to follow up his proceedings to obtain a formal and final concession and delivery of possession.   There is no evidence in the record that the lands claimed have been otherwise appropriated, on account of non-use, or any other cause, or forfeited—the evidence of which, if it existed, could doubtless be found in the office of the alcalde of Camargo.

Under the general colonization law of Tamaulipas, "all land, of which the proprietor makes no use for himself, shall be considered as deserted and uncultivated lands." (Laws of Coahuila and Texas, p. 348, art. 30.)

This was founded on the general policy of that State to have the country settled. But if it had thus become vacant, its subsequent appropriation to another person, or forfeiture, would appropriately be found in the proceedings of the ayuntamiento of that jurisdiction, or in the summary proceedings of the alcalde, on account of its alienation before the expiration of twenty years, in pursuance to a provision in article 4, of the decree No. 24 of 1833, under which this title was commenced to be obtained. So far as it appears from the record in this case, the right of the grantee, as a party entitled to land, had been properly established, and the land had been selected and surveyed, with defined boundaries, previous to the 19th of December, 1836, and it was, therefore, such a right as could, and reasonably would, have been protected, had there not been a change of government.

The manner of proving the existence of this title remains to be considered.

The title filed with the petition was a copy of the expediente, as far as the proceedings went, taken from the records of and certified to by Nieves Villareal, alcalde of Camargo, with assisting witnesses, P. S. Bugnor and Cristobal Morales, on the 23d of June, 1870.

The official position of Villareal, and his authority to give the copy, and the genuineness of his signature and rubric, and those of the assisting witnesses, were proved by the depositions of Nieves Villareal, of Cristobal Morales, and of another witness. In addition to this, it was proved as a "sworn copy," taken and compared by the witness Cristobal Morales, from the records of the alcalde's office, at Camargo, who had the said copy before him when his depositions were taken. This was sufficient proof of the authenticity of the

title. (The State v. Salvador Cardinas, *ante*, p. 250; The State v. Francisco Cuellar, *ante*, p. 295.)

The motion of the defendant to suppress the depositions upon the grounds therein set forth, was properly overruled. The exceptions taken to the answers of the witnesses, giving their opinions as to what were the laws of Tamaulipas, and their construction of them, in regard to the validity and perfection of this title, need not be considered here, because, not being a trial before a jury, it was the duty of the court to know and follow the law existing in any part of the present limits of this State, at the time, and under which, a title to land was acquired. Where one government succeeds another over the same territory, in which rights of real property have been acquired, the preceding government is not a foreign government, whose laws must be proved in the courts of the succeeding government.

The plaintiff, who sues for rights of himself and of his three children, was the husband, and they were the children, of Nicolasa Vargas, deceased, who was the only child of the original grantee, Leonardo Vargas, deceased, which was sufficiently proved on the trial.

As the patent is required to issue to the original grantee, evidencing the validity of the title as against the State, and to inure to the benefit of heirs, or assignees, no reason is seen why plaintiff, for himself and children, may not bring this suit.

There being no error in the judgment of the court, requiring a reversal, the judgment is affirmed.

                                        AFFIRMED.