LEONARD HAYNES V. STATE OF TEXAS.

No. 1562. Decided March 27, 1907.

**1.—Mexican Grant—Tamaulipas—Loss of Sovereignty—Issue of Final Title.**

Where the evidence showed citizens of Tamaulipas to have taken all necessary steps to acquire the right to have final title issued to them, under Decree No. 24 of the Legislature of that State, to lands therein, in the year 1835, but title was not issued by the Governor until 1848, when that State had lost actual sovereignty over the lands, which were situated in Texas, such issuance, though disproving presumption of the grant being completed while the State of Tamaulipas had jurisdiction over the territory, did not affect the standing of the claim as one entitled to recognition from the government of Texas, though not a complete legal title. (P. 431.)

**2.—Same—Rights Under Treaty.**

A citizen of Guerrero, in the State of Tamaulipas, Mexico, who was entitled to receive a grant of land under Decree No. 24 of the laws of that State, and being already in possession, had, in 1835, denounced same before the proper ayuntamiento, which approved his claim, had survey made, delivered to him

the expediente for procuring the issuance of final title from the Governor, and collected of him the payment required by the decree, having done all necessary to entitle him to receive the final title, had a right to the land of a character protected by the terms of the treaty of San Ildefonso, and which should be recognized by the courts of Texas, though it was not a complete legal title, the final title not being issued by that State till it had lost sovereignty over the territory. (P. 431.)

### 3.—Same—Payment—Presumption.

Where it was made the duty of the Ayuntamiento of Guerrero to collect the payment required of a grantee of land before making up the expediente or instructive despatch for the issuance of final title by the Governor of the State, the presumption will be exercised that such duty was performed. (Pp. 431, 432.)

### 4.—Same.

A letter written in 1847 by the Alcalde of Guerrero, transmitting to the Governor the expediente for issuance of final title by him, and stating that the money payment required was in the municipal treasury, was not evidence that it was not paid till that time nor sufficient to overcome the presumption that it had been collected, as required by law, when the expediente was made out in 1835. (P. 432.)

Error to the Court of Civil Appeals for the Third District, in an appeal from Travis County.

The state sued defendants in trespass to try title, and recovered judgment. They appealed, and, on affirmance, obtained writ of error.

*J. F. Mullaly, E. A. Atlee* and *James B. Wells,* for plaintiffs in error. —Where a right amounting to "property" became attached to land under the Mexican government, the treaty of Guadalupe Hidalgo protected and confirmed it, and the title to the land was not conveyed thereby, but remained to the grantee or his assigns. Soulard v. United States, 4 Peters, 511, 10 Peters, 100-106; Strother v. Lucas, 12 Peters, 410, and authorities there cited; Mitchel v. United States, 9 Peters, 734.

Defendants' rights of property in the lands being protected by the terms of the treaty and the law of nations, it was a violation of both, as well as a disregard of the law of Texas of September 3, 1901, to render the judgment for plaintiff. Same authorities; also, Bryan v. Kennett, 113 U. S., 179; Hornsby v. United States, 10 Wall., 242; Carpenter v. Rannels, 19 Wall., 141.

A grant is presumed against the State by long and uninterrupted possession under a claim of ownership; the presumption is that the possession began in right, and that all that might lawfully have been done to perfect the legal title was in fact done, and in the form prescribed by law. Paul v. Perez, 7 Texas, 338; Jones v. Borden, 5 Texas, 411; State v. Cardinas, 47 Texas, 293; Herndon v. Casiano, 7 Texas, 322; Daingerfield v. Paschal, 11 Texas, 579; Sheppard v. Harrison, 54 Texas, 96; Barclay v. Howell's Lessee, 6 Peters, 498; United States v. Chavez, 175 U. S., 509.

The general rule is that a sovereign can not, by granting lands in a conquered territory, impair the value of the conquest after it is apparent that the territory is lost. But where, as in this case, the final grant only conveyed the legal title, the equity having long prior thereto existed in the grantees, and was made before either the date of the treaty of cession or exchange of ratifications, and while the former government was the

only one exercising the functions of government in the territory, such grant was valid and effectual to convey the legal title. State v. De Leon, 64 Texas, 556; secs. 8 and 9 of the Colonization Laws of Tamaulipas of December 15, 1826 (Sayles' Early Laws, art: 89); art. 1 of Decree No. 24 of Tamaulipas, of October 19, 1833; Haver v. Yaker, 9 Wall., 32.

The court erred in holding that the evidence adduced upon the trial by the appellants in this cause was not sufficient to warrant the presumption of the grant to the said original grantee of the grant of land under which appellants claim, as contended for by them. Lewis v. San Antonio, 7 Texas, 306; Jones v. Borden, 5 Texas, 410; Herndon v. Casiano, 7 Texas, 322; Paul v. Perez, 7 Texas, 338; Daingerfield v. Paschal, 11 Texas, 579; Morris v. Byers, 14 Texas, 278; State v. Cardinas, 47 Texas, 293; Sheppard v. Harrison, 54 Texas, 96; Fuller v. Fletcher, 44 Fed. Rep., 34, et seq.; Fletcher v. Fuller, 120 U. S., 534; United States v. Devereaux, 90 Fed. Rep., 187; Grayson v. Lofland, 52 S. W. Rep., 123; Barclay v. Howell's Lessee, 6 Peters, 498; United States v. Chavez, 175 U. S., 509; 1 Greenleaf on Evidence (Lewis ed.), sec. 45; 2 id., sec. 541; Lawson's Presumptive Evidence, "The Presumption from Possession and Lapse of Time," chap. 18, especially pp. 479-488 inclusive, and notes; Richards v. Elwell, 12 Wright, 361; Turner v. Waterson, 4 W. & S., 171; Hastings v. Wagner, 7 W. & S., 215; Brock v. Savage, 46 Pa., 83; Doe Ex. Dem. Fenwick v. Reed, 5 B. & Ald., 232; Jackson v. McCall, 10 Johns., 377, 6 Am. Dec., 343; Jackson v. Murray, 7 id., 5; Jackson v. Hudson, 3 id., 375, 3 Am. Dec., 500; Strimpfler v. Roberts, 18 Pa. St., 299.

*C. K. Bell,* Attorney-General, for defendant in error.—An imperfect title emanating from a former, and unrecognized by the existing government, forms no foundation for an action and constitutes no defense against one. Paschal v. Perez, 7 Texas, 347; Trimble v. Smithers, 1 Texas, 789; League v. De Young, 2 Texas, 500; Land Commissioner v. Bell, Dallam, 368; Houston v. Robertson, 2 Texas, 16; Norton's Succession v. Commissioners, 2 Texas, 358; Kempner v. Victoria, 3 Texas, 138; 1 Sayles' Real Estate Laws, sec. 514.

The governor of Tamaulipas had no authority to grant lands in Texas on the 2d day of January, 1848. State v. Bustamente, 47 Texas, 320.

BROWN, Associate Justice.—The State of Texas sued Leonard Haynes to recover five leagues of land situated between Nueces River and the lower Rio Grande, which is within the limits of the territory of the State of Tamaulipas as it existed prior to the Texas Revolution. The land was surveyed for the State in 1884, and there is, of course, no question of the State's right to it unless the plaintiff in error has shown a right to the land which originated at a date prior to the 19th day of December, 1836, and which right is protected by the treaty of Guadalupe Hidalgo between the United States and Mexico. Haynes claims by mesne conveyances under Antonio Zapata, who claimed to have acquired a right to the land by a grant made by the Governor of Tamaulipas under decree No. 24 of the Congress of that State. We copy the decree as follows:

"No. 24. The Constitutional Congress of the Free State of Tamaulipas has decreed the following:

"Article 1. To the inhabitants of Camargo, Mier, Guerrero and Laredo, who may have no lands of their own, and who may possess stock to occupy them, there shall be given at once not exceeding five leagues each, and in compensation they shall pay the State $10 for each league.

"Article 2. Those only are comprehended in the foregoing article who lived in said villages during the last Indian war now passed, and who did not emigrate previous to the year 1821.

"Article 3. The respective ayuntamiento shall inform itself by previous justification whether the interested party, who may present himself, has lands of his own, and stock with which to occupy them.

"Article 4. These lands shall not be alienated until twenty years have passed after the concession; and, if so alienated, the State recovers its right to them, and he who may have been the owner loses whatever advances and useful and necessary improvements that he may have made; it being sufficient for a judgment of condemnation that the alienation shall be made to appear. Upon this point the respective administering judge shall decide summarily, without prejudice to the legal remedies of the interested party.

"Article 5. The benefits of article 1 shall continue for three years from the day of the approval of this decree, after the expiration of which term no one shall obtain lands except according to the ordinary laws.

"Article 6. The ayuntamiento, and their individual members collectively, and each one for himself, are responsible personally and pecuniarily if they are wanting in the truth of the inquiry exacted by article 3, and the government, having heard their defense, shall make their responsibility effective.

"The Governor of the State shall take care that this decree be understood, and shall order its execution, having it printed, published and circulated, and that it be duly executed."

There is no question made of Zapata's qualification to acquire the land; that is, that he was one of those who had settled in that section of the country and remained there, according to the terms of the decree. The Court of Civil Appeals found the following facts, which constitute the right of Zapata to the land in question: "We conclude that the evidence in the record justifies the assumption that Zapata and Bustamente denounced the lands in controversy before the ayuntamiento of Guerrero in 1835, and that that body passed favorably upon the application; that a survey was made by Canales, the Surveyor-General of Tamaulipas, in 1835, of these two purported grants, and the expediente was formed and became an archive of the public records at Guerrero, and that the claimants were in possession of the land prior to the denouncement. The evidence does not show any juridical possession, but the fact that they were in possession when the lands were denounced, and continued in possession thereafter, was sufficient to dispense with juridical possession, as is decided in the case of State v. Sais, 60 Texas, 88; and they continued in possession for such length of time as would justify a presumption of grant, provided the evidence in the record did not repel such presumption. The evidence also warrants the assumption that,

while a copy of the expediente was not introduced in evidence, the copy of the index, as stated by the facts, indicates that an expediente was formed, and such fact is also established by the parol evidence in the record. Copies of the record of the denouncement to the ayuntamiento, and the favorable action of that body upon the application, were not introduced in evidence; but the evidence in the record, which is not objected to, tends to show that such denouncement was made to the ayuntamiento, and they acted favorably upon it. The evidence in the record also shows that the public archives in the City of Victoria were destroyed by the French troops in 1864, and that the records of Guerrero were imperfect and mutilated, and many missing, which fact would justify us in assuming that the record evidence of steps taken to acquire title which was not produced was lost or destroyed. The only evidence showing that the purchase price of the land was paid is the statement contained in a letter to Canales of date November 28, 1847, found upon page 141 of the record."

On the 28th day of November, 1847, Fabian Zapata, First Supplemental Alcalde of the municipality of the city of Guerrero, wrote to His Honor, General Don Antonio Canales, at the City of Victoria, Tamaulipas, as follows: "I remit to you seventeen titles, which contain the vacant lands denounced and surveyed from the year 1831 until that of 1835, in order that Your Honor may please present them to the Honorable Governor of the State, to the effect that they may have the necessary validation. The amount of the dues I do not send attached to said documents so as not to expose the same, and Your Honor will deign also to direct in the most certain manner the mode in which they may be paid, and draw against this receiver's office. God and Liberty."

The Governor of Tamaulipas issued to Antonio Zapata the following final grant: "Francisco Vital Fernandez, Brigadier-General of the Army of the Mexican Republic, and Governor of the State of Tamaulipas. Whereas, the citizen, Antonio Zapata, has paid into the Treasury of the State the $50, at which were valued the five sitios of pasture land for large stock denounced by him at the point de Villa, as appears by the expediente made for the purpose, using the power that the law gives me upon this particular, I have thought proper to adjudicate to the citizen Antonio Zapata, for himself, his heirs and successors, the said five sitios for large stock, within the limits and boundaries made on the attached map. Therefore, I order the authorities and inhabitants of the State to recognize the said citizen Antonio Zapata as the legitimate owner of the said five sitios of pasture land for large stock which are thus granted. Given at the City of Victoria on the 2d day of the month of January, Eighteen Hundred and Forty-eight."

The following articles of the Colonization Law of 1826 of the State of Tamaulipas are pertinent to the issue involved in this case:

"Art. 7. From the very date whereon a foreigner is thus registered he acquires domiciliation, and may, as such an inhabitant (denunciar), the vacant land he thinks best, presenting himself to that effect by writing to the respective Alcalde, who shall decree what is proper for examining, measuring and marking out the land designated, after citing the adjoining proprietors, should there be any.

"Art. 8. The instructive despatch being terminated, and no opponent of right resulting, the Alcalde shall pass it to the Executive of the State by whom the title of adjudication and ownership shall be issued to the person interested, ordering that the Alcalde of the town of his residence put him immediately in possession of the land granted. All these proceedings shall be conducted officially, and the Executive shall proceed with the audience of the fiscal of the Supreme Court of Justice of the State.

"Art. 24. The ayuntamientos, each in its limits, shall collect said funds gratis by means of a commission from within or without their own body, and shall pass them according as they are collected to the depositary or Treasurer, that they may be of their funds or means, who shall give the corresponding receipt; and, without further interest than two and a half percent that shall be paid him, he shall place them at the disposal of the executive, giving him notice every month of the receipts and remittances thereof, and of any negligence or deceit he may notice in their collection. Of the management of the Treasurer and that of the Commission, the officers themselves, and Commissioners, shall be responsible with their property; and moreover, the members of the Ayuntamiento who choose them, and that this responsibility may at all times be effectual, the said appointments shall be made viva voce, and notice thereof shall be immediately given to the Executive."

The learned judge who wrote the exhaustive opinion of the Court of Civil Appeals said, in substance, that the facts found by that court would justify the presumption that a grant had been made by the Governor of Tamaulipas, if it were not shown by the testimony that the Governor of Tamaulipas had issued a final title to Zapata, which was void, because he had not the power to do so at the time that it was granted. The issuing of the final title, without authority, could not affect the right which existed, and upon which the unauthorized act was based. (State v. Bustamente, 47 Texas, 320.) Therefore, discarding the title issued by Canales, Governor of Tamaulipas in the year 1848, we have the facts still existing which, if sufficient to justify a presumption of a grant, must be sufficient to establish a right to the grant. If, therefore, the evidence introduced upon the trial shows that Antonio Zapata was, on the 19th day of December, 1836, entitled to have a grant issued, the State ought not to recover the land in controversy, because such a title would be protected by the treaty of Gaudalupe Hidalgo. It is true that the Attorney-General insists that the facts do not establish such a title as would be embraced in the terms and protection of that treaty, but we are of opinion that the position is not well taken. ( State v. Sais, 47 Texas, 307.)

If it be conceded that the $10 per league was the purchase price for the land, which must be paid before a right to the land accrued to Zapata, then under the law, as it then existed, it was the duty of the Ayuntamiento of the village of Guerrero to collect from Antonio Zapata the $10 for each league before making up the expediente or instructive despatch, and to deposit the money in the treasury of that village, subject to the order of the Governor. The undisputed evidence in the case, and the finding of the Court of Civil Appeals, establishes the

fact that, before the 19th day of December, 1836, the Ayuntamiento of Guerrero did make up the instructive despatch, embracing all papers required by law to show the right of Antonio Zapata, and a compliance by him with the requirement of the law upon which the Governor of Tamaulipas was authorized to issue the final title. It was shown that the records of the Ayuntamiento of Guerrero were mutilated, and many of them destroyed or lost, and that the expediente of Zapata had at one time been in the archives of Victoria, the capital of Tamaulipas, which were destroyed in 1864 by the French soldiers. In this state of the facts there would arise the presumption that, before the Ayuntamiento made up the instructive despatch or expediente, everything was done that the law required to be done as a basis of their action, and that the $10 per league had been collected from Zapata and deposited with the Treasurer in accordance with law. (Olcott v. Gabert, 86 Texas, 126; State v. Sais, 60 Texas, 90.) This presumption might have been disproved, but it is undisputed, and the concurrent facts support it, so that the presumption is entitled to the same weight as the undisputed testimony of a credible witness. It is, however, suggested in the opinion of the Court of Civil Appeals, that the letter which was written in 1847 by the Supplemental Alcalde of Guerrero to the Governor of Tamaulipas shows that the money was paid in 1847. The letter does not state that the money was paid at that time, but that it was not forwarded with the expedientes which were sent in seventeen cases for the reason that it was unsafe to do so. These seventeen packages of paper, which constituted the evidence of right in Zapata and others to the lands granted, had remained in the archives of Guerrero from 1835 to 1847, and it is entirely consistent with the terms of the letter, and with the facts established in connection with it, that the money collected by the Ayuntamiento from Zapata was still in the Treasury of Guerrero, although it was collected in 1835. There is not a fact or circumstance to which we have been pointed by the counsel for the State which would in the least impair the force of the presumption of law, that the money was collected at the time the land was surveyed and the title papers made up by the municipal officials. The facts of this case establish that Zapata, under whom the plaintiff in error claims, had, on the 19th day of December, 1836, done all that the law required of him, and was entitled under the laws of Tamaulipas to receive from the Governor of that State a grant for the five leagues of land. It follows from this conclusion that we must reverse the judgments of the District Court and of the Court of Civil Appeals.

The question arises, shall we remand the case to the District Court for another trial, or shall we render judgment for the plaintiff in error? If the facts of this case furnished any ground for a difference of opinion as to the rights of Antonio Zapata, under the laws of Tamaulipas, to receive a grant of the land in question, it would be our duty to remand the case for another trial. It is evident, from the opinion of the Court of Civil Appeals, that they would have reversed the judgment of the District Court but for the fact that they construed the letter from Fabian Zapata to the Governor to mean that the money, $10 per league, was paid at the time that the papers were forwarded to the Governor; but we are of opinion that that construction of the letter was incorrect, and

was unsupported by the attending circumstances. Assuming that the $50 for the five leagues was collected from Zapata at the time the surveys were made and the instructive despatch formulated, we are not able to see how there could be a difference of opinion as to the right of the plaintiff in error to the land in controversy. It is therefore ordered that the judgments of the District Court and that of the Court of Civil Appeals be reversed, and that judgment be here rendered for the plaintiff in error.

*Reversed and rendered.*