STATE v. GALLARDO et al.

(Court of Civil Appeals of Texas. Feb. 8, 1911. Rehearing Denied March 8, 1911.)

1. JUDGMENT (§ 116*)—DEFAULT JUDGMENT—RELIEF.

Plaintiff in trespass to try title is entitled to final judgment against defendants who fail to answer; but, where it is not shown that such defendants had title to any of the land, the relief awarded as against the defaulting defendants will not affect the rights of the other defendants in whose favor judgment was rendered against plaintiff.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 232; Dec. Dig. § 116.*]

2. JUDGMENT (§ 680*)—CONCLUSIVENESS—TITLE TO REAL ESTATE—CO-OWNERS.

Acts 1870, c. 83 (Paschal's Dig. art. 7008, etc.), authorized any person, either the original grantee or legal assignee of land situated between the Nueces and Rio Grande rivers, to sue for the adjudication of any claims against the land, and required the claimant to make affidavit that he was the true and lawful owner or part owner of the land. Held, that a judgment in such a proceeding, instituted by one of several co-owners, in which it was determined that the title was in the state, is not conclusive upon other owners.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1201; Dec. Dig. § 680.*]

3. PUBLIC LANDS (§ 223*)—MEXICAN GRANT—TOWN DONATION — ABANDONMENT — REVERTER.

Where a grant of common lands is made to a town, the inhabitants take no title except the right of user; but the town holds the property in trust for the inhabitants, and if the town is removed by order of the government which established it, and other land is granted by the government for a similar purpose at the new location, the title to the old commons reverts to the government.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 223.*]

---

**4. INTERNATIONAL LAW (§ 6\*) — CHANGE OF SOVEREIGNTY—EFFECT ON PRIVATE RIGHTS.**

A change of sovereignty, even in the absence of treaty stipulations for the protection of private rights, does not devest vested property rights of individuals, and an intention by a nation that has wrested territory from another to destroy private rights in such territory by confiscation of lands acquired from the former government must be clearly and distinctly declared by the political department of that nation, before the courts will hold that such was the intention.

[Ed. Note.—For other cases, see International Law, Cent. Dig. § 6; Dec. Dig. § 6.\*]

**5. PUBLIC LANDS (§ 198\*)—MEXICAN GRANTS —SUFFICIENCY.**

The protocol to the treaty of Guadalupe Hidalgo announced that the American government, by suppressing the tenth article of the treaty, did not intend to annul grants of lands made by Mexico in the ceded territories, but that those grants should preserve their legal value, and the grantees might cause their titles to be acknowledged before American tribunals, and that, conformable to the law of the United States, legitimate titles existing in the ceded territories are those which were legitimate titles under the Mexican law in Texas up to the 2d of March, 1836. Prior to 1836 the Mexican government exercised jurisdiction between the Rio Grande and Nueces rivers, and that territory consisted of the state of Tamaulipas. While that state was still exercising actual jurisdiction, though after Texas had asserted its claim to the territory, the state of Tamaulipas sold the land in question and received the purchase money, and the sale was confirmed by the Mexican government before the territory was actually occupied by the United States on behalf of Texas. *Held*, that the title to the land so sold was in the purchasers, and not in the state.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 198.\*]

**6. PUBLIC LANDS (§ 199\*)—MEXICAN GRANTS —MEXICAN LAWS — CONSTRUCTION — POWER OF GOVERNORS.**

Spanish and Mexican Land Laws, vol. 3, No. 1626, art. 13, provides that until the attributes of the government and departmental boards, in what relates to the treasury, are declared by law, the Governors shall make no sales of lands without the previous approval of the supreme government. *Held*, that the article was not intended as a restriction upon the power to make sales, but was an instruction not to exercise such powers without the approval of the supreme government until the happening of the contingency therein referred to.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 625–633; Dec. Dig. § 199.\*]

**7. PUBLIC LANDS (§ 208\*)—MEXICAN GRANTS —POWER OF OFFICER—PRESUMPTIONS.**

Where land in Texas, formerly within the limits of the Mexican state of Tamaulipas, was sold under the authority of that state, and the possession of the purchasers has been long continued, and the sale acquiesced in by all governments concerned, the previous approval of the government of Mexico of the sale will be presumed.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 657; Dec. Dig. § 208.\*]

**8. PUBLIC LANDS (§ 221\*)—DISPOSAL—STATUTES—CONSTRUCTION—SURVEYS OF LAND.**

Act Feb. 10, 1852 (Laws 1852, c. 69), provided that the field notes of all surveys made previous to the passage of the act "shall be laid out and returned in the manner required by law to the General Land Office on or before the 31st of August, 1853, or they shall become null and void, and the said surveys shall become vacant land, and be subject to be relocated and surveyed as in other cases by a person holding a genuine land certificate or other legal evidence of claim to land." *Held*, that the act referred only to surveys of land made under laws of the republic or state of Texas, and not to titles previously granted by the Spanish or Mexican government.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 685–697; Dec. Dig. § 221.\*]

Appeal from District Court, Travis County; Charles A. Wilcox, Judge.

Action by the State against Jose L. Gallardo and others. Judgment for defendants, and plaintiff appeals. Judgment reversed and rendered in part, and in part affirmed.

The state of Texas, acting through the Attorney General's department, brought this suit in trespass to try title, seeking to recover two leagues of land situated in Hidalgo county, and described, in part, in plaintiff's petition as "all that part of that certain tract or parcel of land known as 'Los Ejidos' that lies on the north side of said Rio Grande river." Jose L. Gallardo and a large number of others were made defendants; the plaintiff alleging that they had unlawfully entered upon and ejected the plaintiff from the possession thereof on the 1st day of June, 1900, and had continuously since that time been in possession, receiving and enjoying the fruits, rents, and revenues arising therefrom. W. A. Boswell, L. D. Brooks, J. P. McDonald, and F. Spaeth were also made parties defendant; the state alleging that they were asserting some character of claim to the land. The four defendants last named filed an answer in which they admitted the truth of the material allegations in the plaintiff's petition, but alleged that they had made proper applications to purchase the land from the state, and were therefore entitled to have it awarded to them. Several of the other defendants failed to answer, and an interlocutory judgment by default was rendered against them. The other defendants filed answers, the full scope of which need not here be stated; it being sufficient to say that they included pleas of not guilty and general denials. The state filed a supplemental petition, which included a plea of res adjudicata. The defendants who had answered, except Boswell, Brooks, McDonald, and Spaeth, filed a supplemental answer challenging the sufficiency and legal effect of the matters pleaded as res adjudicata. The case was tried before the court without a jury and final judgment rendered against the state and in favor of all the defendants except Boswell, Brooks, McDonald, and Spaeth. As to the latter defendants the court held that, as the proof showed that the state had never had any title to the land, there was no issue to be determined between them and the state, and as to them the suit

was dismissed. The state alone has prosecuted an appeal.

There is little, if any, conflict in the testimony, and the salient facts are as follows: In 1767 the government of Spain granted to the town of Reynosa four leagues of land as town commons. The grant referred to included other lands to individual settlers, and reads as follows:

"Municipal Hall of the

[Corrected Rubric.]

| Seal. |

Town of Reynosa.

"Don Juan Fernando de Palacio, vowed Knight of the order of St. James and Commander of the shield in the same, Field Marshall of the Armies of his Majesty, Governor and Lieutenant of the Captain General of the Colony of the Gulf of Mexico, and Sierra Gorda, their Missions, Garrisons and Frontiers; and the Licentiate Don Joseph Ossorio y Llamas, Advocate of the Royal Council, commissioned to visit the same by his Lordship the Marquis of Croix, Vice-Roy, Governor and Captain General of the Kingdom, we do hereby certify that in the Fifth Budget which treats of the distribution of lands we find the following:

Two Seals.

[Rubric.]

"Act.

"Inasmuch as there has not been at this place any individual distribution of lands, although frequently directed by Royal Orders, let the citizens of this town be informed that they shall convene after morning Mass, through the medium of the Captain, in order to appoint two experts for the purpose of classifying the lands in reference to those that are irrigable and those that are temporarily irrigable and suitable for cultivation, grazing, pasturage, commons, and those suitable for the town, for the purpose of giving them an equitable distribution, that all may share in the good and bad, and to select those best adapted to the Mission, of which notice shall be given to the Reverend Father in charge, who has to supervise sundry matters, not only for himself but for the natives under his protection, that he may ask for the land best adapted for his purposes. It shall also be made known to the citizens that they shall appoint two surveyors who jointly with Santiago Longoria and Joseph Bernardo Gomez, citizens of Camargo, whom as impartial persons we nominate on the part of his majesty, to execute said distribution in conformity with the instructions which shall be given to them, with attention to the particular circumstances of the lands, the town and its inhabitants. And it shall also be made

known to them the resolution contained in Chapter First of the Mandate of the Twenty-Ninth of March, of the year One Thousand Seven Hundred and sixty-three in order that they may give information or a statement whether this settlement has moved from some other point, and if they have not done so, then to select the place that may accommodate and suit them best in order to fulfill the mandates of his majesty.

"Enacted at Reynosa, on the Twenty-third day of August, One thousand seven hundred and sixty-seven—Juan Fernando de Palacio-Licenz do Don Joseph Ossorio.

*    *    *    *    *    *    *    *

"Act.

"In consequence of the result of the foregoing proceedings we declare and set apart as the boundaries of the town commons, as commons, pastures and estates of the Town, one league round about, counting from its center, the survey to be run west and marked at the point called El Desierto, in front of the ranch of Xavier Zamora; towards the east to the place called Ramadita; towards the south to the place called and marked as Berendas; to the north to the place known and marked as Santa Gertrudes; and the town shall enjoy all within the said limits; and the Mission all that may belong to it and that looks towards those that [Rubric.] shall be set apart for its benefit, and the one and the other may freely let their stock loose thereon without injury to third parties; and the corresponding league on one of the aforementioned courses we set apart and designate as Town property, upon which, in urgent cases, a tax may be imposed to be disbursed availably and reasonably, as shall be directed at the end of this book. The surveyors shall proceed at once to survey and set apart to each of the Ninety-two registered citizens their respective porcions, giving to each of the Original Colonists two leagues of pasture land for small stock and twelve Caballerias of land, the first for grazing the second to be dedicated to planting; to the sons of these and to the old settlers who have been in the service for six years and upwards, two leagues of pasture land for small stock and six Caballerias of planting land; to the recent settlers only the two leagues of pasture land for small stock; and for this object they shall carry with them a list taken from the Registry; to the Captain is conceded a double Porcion; and to each one shall be left a watering place on the river for cattle; narrowing the fronts and lengthening the depths so as to accommodate a greater number, compensating in length the deficiency in width; trying to avoid all injury, and taking note of the ranches or improvements of each individual so as to include it in the porcion that he may receive, and not to injure anyone unjustly; and the others, should they disagree, shall draw

lots for their porcions, and for this object they shall be numbered; and this Act shall be made known to them that they may comply therewith, and they shall be informed of the quantity of varas in each league and Caballeria as they are instructed; and this being done they shall proceed to survey the Public Square, taking into consideration its circuit and the vicinage, assigning them Town lots under the stipulations and conditions as below shall be prescribed.

"Enacted at Reynosa on the Twenty-sixth day of August, One thousand seven hundred and sixty-seven, with witnesses of assistance who in all the proceedings were present, we sign it.

"Palacio Lizdo Ossorio. Of Assistance, Duran. Of Assistance Federico Losada."

The town commons referred to, otherwise known as the "Ejidos," crossed the Rio Grande river, and the portion thereof that was on the north side of that stream is the land in controversy in this suit. It appears from the statement of facts that at some time prior to August 31, 1836, probably in 1801, upon the petition of the citizens of Old Reynosa, the town or municipality was by the government removed from that place to another, about six leagues away. The cause of such removal was the danger of inundation by the flood waters of the Rio Grande. After the removal referred to, and on August 31, 1836, the alcalde of New Reynosa addressed a letter to the Governor of Tamaulipas, stating that disputes had arisen among the owners of certain lands adjacent to the "Ejidos" or commons of Old Reynosa, as to the boundaries of their respective tracts, in which letter he recommended the sale of the commons or "Ejidos" of Old Reynosa. That letter was referred to the Departmental Junta at the city of Victoria, and that body addressed a communication to the Governor, recommending that the commons of Old Reynosa be reduced to private property by public sale to the highest bidder. The property was ordered sold by an order which reads as follows: "City of Victoria, October 5th, 1836. The government upon consideration of the opinion of the Departmental Junta orders: That the commons of Old Reynosa be reduced to private property, to effect which that alcalde will proceed to the sale thereof at public auction to the highest bidder or bidders, and shall credit the proceeds of the same to the departmental revenues. That with respect to the indemnification claimed by Mr. Domingues, he shall present proofs of the quantity of land ceded so that the same may be paid for or returned to him in land. That respecting the twenty-seven cords still due the owners of lands situated on this side of the river, the same shall be deduced proportionately from all the porciones of land here situated, those remaining reduced to the amount resulting after this is done. Fernandes. Franco Villasenor, Sec."

In pursuance of that order, the alcalde of Reynosa proceeded to sell at public auction the commons of Old Reynosa. The sale was consummated on the 9th day of November, 1836 by the acceptance of the bid of Fruto de Cardenas of $210, which sum was paid on that day. Fruto de Cardenas, in making the purchase referred to, was acting for 96 inhabitants of Old Reynosa. On November 10, 1836, the alcalde who made the sale ordered that a deed of conveyance be made to the 96 purchasers. On the 24th day of July, 1837, the alcalde ordered the land surveyed before the issuance of title, and after the survey was made and the purchasers had paid the fees of the surveyor, which were paid September 23, 1841, a testimonio of title was issued on the 24th day of September, 1841, by the alcalde of the town of Reynosa to the 96 purchasers who had bid in and paid for the land. It is conceded that appellees Jose L. Gallardo and his associates claim and hold title under that sale; and the proof shows that some of them, and the ancestors under whom they claim, have been in possession of the lands so acquired, some on the Texas side and others on the Mexican side of the river, for 40 or 50 years.

The case was tried on an amended petition, which does not disclose when the original petition was filed; but, as the original answer of Gallardo and his branch of the defendants was not filed until February 29, 1908, we take it for granted that the suit was commenced only a short time before that date. It is true, as contended on behalf of the state, that the uncontroverted testimony shows that the old town of Reynosa had been abandoned and the municipality by that name removed to another place. The abandonment referred to is recited in the communication from the alcalde to the Departmental Junta, and in the communication from that body to the Governor, and it would seem that, as a result of the removal and abandonment referred to, the title to the land in controversy reverted to the government.

On September 26, 1871, Noberto Garza filed a petition in the district court of Travis county, Tex., against the state of Texas for confirmation of title to the land in controversy in this case, under the act of August 15, 1870. The Attorney General filed an answer for the state, and on February 12, 1873, the district court rendered judgment against the plaintiff, and thereafter the latter appealed the case to the Supreme Court, and that court rendered judgment affirming the judgment of the district court. It was shown that the plaintiff in that case relied upon the sale of November 9, 1836, that is relied upon by the appellees in this case.

An official map of Hidalgo county, dated April, 1880, designates the land in controversy as "Los Ejidos de Reynosa." It also delineates and designates the various porciones

granted to individuals and adjacent to the land in controversy. It delineates and designates the old town of Reynosa immediately across the river on the Mexican side. Another official map of the county dated April, 1896, contains substantially the same delineation and designation. It also contains certain marks, figures, and letters indicating that at some time certificates had been filed on the same land. Both the maps referred to are on file in the General Land Office of this state.

This case was tried in May, 1909, and it was shown that many of the defendants, Gallardo et al., had been paying taxes each upon a specified number of acres of the land, ranging from 10 to 1,500 acres, from 1883 up to the time of the trial. It is recited in the testimonio of title which was issued by the alcalde of Reynosa September 24, 1841, that the sale had been made with the consent of the Departmental Governor; and it seems to be conceded in the briefs of both parties that the order of sale issued October 5, 1836, was issued by order of the Governor of Tamaulipas. There was testimony showing a tradition in that locality to the effect that the ancestors of the Mexican appellees had claimed and held possession of the land in controversy under the sale of November 9, 1836, from that date. There was no proof of actual occupancy at that time; but there was proof tending to show that some of the purchasers and their descendants had resided on and used the land in controversy for 40 or 50 years; and it was shown that since that time, and many years ago, many other claimants under that title established their residences upon and became actual occupants of small portions of the land. In fact, the testimony shows that for many years there have been two or three villages on the land in controversy, consisting largely of claimants under the sale referred to and their families.

There was testimony tending to show that the Commissioner of the Land Office has treated the land in controversy as titled land. It was shown that in 1905 the defendants Brooks, Boswell, McDonald, and Spaeth each made a separate application to purchase four sections of the land, and that the county surveyor of Hidalgo county made surveys upon each application and returned the same to the General Land Office. It was also shown that the Commissioner of the Land Office had taken no action in reference to the claims asserted by Brooks, Boswell, McDonald, and Spaeth.

As required by the act of 1870, the Attorney General of Texas filed an answer and resisted the application of Noberto Garza for confirmation of the title asserted under the sale of November 9, 1836; and, aside from the action of the Attorney General in that respect, it was not shown that the government of Texas has ever contested the validi-ty of that title until this suit was instituted in 1908.

Jewell P. Lightfoot, Atty. Gen., and L. A. Dale, Asst. Atty. Gen., for the State. Frank C. Pierce, Duval West, James B. Wells, D. B. Chapin, and Clark & Bliss, for appellees. L. D. Brook, amicus curiæ.

KEY, C. J. (after stating the facts as above). Speaking generally, the questions presented for decision are: First, alleged error in refusing to render final judgment in favor of appellant against the defendants who failed to answer; second, alleged error in refusing to sustain the plea of res adjudicata; third, alleged error in holding that the grant from the King of Spain was available as a defense; and, fourth, alleged error in holding that appellees had title available as a defense under the sale of November 9, 1836. Of course, some of these questions involve more than one question of law; but they constitute a sufficient general statement, and will now be considered in the order stated.

1. We sustain the contention that appellant was entitled to final judgment against the defendants who failed to answer, and in that respect the judgment of the trial court will be reversed and judgment here rendered for appellant. However, it is not contended in appellant's brief that the proof shows that either of the defendants referred to had title to any of the land, or, at any rate, had title to any specific portion of it; and therefore the relief awarded appellant as against the defaulting defendants is not intended to affect the rights of the other defendants in whose favor the court rendered judgment against appellant. And it may be that the only benefit which the state will derive from our decision in this regard will be its right to collect from the defaulting defendants such costs as accrued on account of making them parties to the suit and in prosecuting this appeal.

2. We have reached a conclusion adverse to appellant's contention in reference to the plea of res adjudicata. The act of 1870, under which Noberto Garza sought a confirmation of title, has heretofore received consideration at the hands of our Supreme Court in State v. Cardinas, 47 Tex. 250, and other cases reported in the same volume; and it is there held, in effect, that the statute created a special tribunal and authorized a special proceeding, not for the purpose of determining all questions of title between the applicant and the state, but for the purpose of obtaining a confirmation of the particular title presented for consideration. Furthermore, it seems to us that, if it was not intended by the statute referred to that all persons holding under the same title should be made parties to the proceeding for confirmation, it certainly was not intended that such a proceeding, instituted by one of

several co-owners, could result in an adverse judgment that would be binding upon and conclude such other co-owners from thereafter asserting claim under the title therein considered and adjudicated. It is true that the statute referred to requires the petitioner to make oath that he is the owner, in whole or in part, of the land described in his petition, and set forth the title under which he claims it. We think the language "in whole or in part" was used because the Legislature supposed that in some instances one person might be the sole owner of a particular title, while in other instances the title might belong to several different owners. Therefore in the first class of cases the petitioner could swear that he was the owner of the entire title, while in the other class of cases each petitioner could swear that he was the owner in part. It is not claimed that any of the defendants in this suit asserted title through Noberto Garza, and we cannot sustain the contention that the law made them parties to the former suit. Hence we conclude that no error was committed in deciding against appellant on the question of res adjudicata.

3. The trial judge did not file conclusions of fact and law, and therefore we do not know whether he held that both titles asserted by appellees were valid, and, if only one, which of the two. Counsel for appellees contend that both titles are valid, and in support of that contention in reference to the grant from the King of Spain they cite New Orleans v. United States, 10 Pet. 662, 9 L. Ed. 573, in which case it was held that a grant of certain lands as commons to the city of New Orleans by the King of Spain vested title in that municipality, for the benefit of its citizens, and that the United States, as successor of Spain, was not entitled to recover that land. It is contended on behalf of the state that the grant from the Spanish Crown in this case did not vest any title in the inhabitants of Old Reynosa, and, if it did, and such title still exists, it is a mere equity and not protected by the treaty of Guadalupe Hidalgo. It is also contended on behalf of the state that the title papers embraced in the expediente, showing the sale of the commons of Old Reynosa of November 9, 1836, disclose the fact that, on petition of the inhabitants of Old Reynosa, the government and all the people, except a few, abandoned that town and removed that municipality to the place now officially known as "Reynosa," and frequently called "New Reynosa." The documents referred to support that contention, and we are of opinion that the title to the commons of Old Reynosa then and there reverted to the government. Prior to that time the title to the commons was vested in Old Reynosa, and the inhabitants of that town had no title thereto, other than the right of user. The town held the property in trust for the benefit of the inhabitants of the town, and when the town itself was removed by order of the government which had established it at that place, and other land was procured by the government to be used for a similar purpose at the place where the town was removed to, the title of the town to the old commons thereof, and all of the rights springing therefrom, reverted to the government. This conclusion eliminates from the case the defense resting upon the title granted by the King of Spain.

4. This narrows the case down to the question of title based upon the sale made in November, 1836. Appellant's assignments of error, as presented in its original brief, urge but one objection against that title, and that is that it is not protected by the treaty of Guadalupé Hidalgo, and therefore is not available as a defense. In a supplemental brief, which has been filed by permission of the court since the case was submitted, it is contended on behalf of the state, and as fundamental error: First, that from and after October 3, 1835, Governors of departments, formerly states, had no authority to sell lands without the previous approval of the supreme government of Mexico; and, second, that it was not shown that the field notes of appellees' title were returned to the General Land Office of Texas on or before the 31st day of August, 1853, as required by the act of February 10, 1852 (Laws 1852, c. 69). These contentions are controverted by counsel for appellees. In determining appellees' rights based upon their purchase from the Mexican government, and as affected by the treaty of Guadalupe Hidalgo, it should be borne in mind that a mere change of sovereignty, even in the absence of treaty stipulations for the protection of private rights, does not divest the vested property rights of individuals. While it may be true that there is no international law, in the sense of a law interpreted and enforced by a tribunal having authority to enforce it as between nations, yet there are certain universal usages and customs among civilized nations, founded upon such high considerations of justice that they are designated by text-books and courts as the "Law of Nations."

The Supreme Court of the United States, in Delassus v. United States, 9 Pet. 117, 9 L. Ed. 71, used this language: "The right of property, then, is protected and secured by the treaty; and no principle is better settled in this country than that an inchoate title to lands is property. Independent of treaty stipulation, this right would be held sacred. The sovereign who acquires an inhabited territory acquires full dominion over it; but this dominion is never supposed to divest the vested rights of individuals to property." And in Mitchel v. United States, 9 Pet. 711, 9 L. Ed. 283, the same court said: "That by the law of nations, the inhabitants, citizens, or subjects of a conquered or ceded country, territory, or province, retain all the rights of property which have not been taken from

them by the orders of the conqueror, or the laws of the sovereign who acquires it by cession, and remain under their former laws, until they shall be changed."

If it be conceded that when one nation has, by force, wrested territory from another, it has the power· to destroy private rights in such territory by the confiscation of lands which had been acquired from the former government, still such course of conduct would be so contrary to every sense of justice as that no court should hold that such was the intention of the conquering nation, unless it was clearly and distinctly so declared by the political department of that nation. Keeping in view these principles, and assuming for the present that the sale of November 9, 1836, under which appellees claim title, was made by the proper officer and under proper authority, in so far as the Mexican government was concerned, then upon what ground should the courts of Texas refuse to sustain that title? Counsel for the state have cited decisions of the Supreme Court of the United States, alleged to support the proposition that the guaranties of property rights contained in the body of the treaty of Guadalupe Hidalgo were not intended to have any bearing upon title to property situated within the borders of Texas. And they make the further contention that the title under consideration is not protected by the protocol to that treaty, because it is therein stated that, while in striking out the tenth article of the treaty as originally presented the United States did not intend to annul the grants of lands made by Mexico in the ceded ·territories, still it is further stated that, conformably to the law of the United States, legitimate titles are those which were legitimate titles under the Mexican law in Texas up to the 2d of March, 1836.· The clause referred to reads as follows: "The American government by suppressing the tenth article of the treaty of Guadalupe did not in any way intend to annul the grants of lands made by Mexico in the ceded territories. These grants, notwithstanding the suppression of the article of the treaty, preserve the legal value which they may possess, and the grantees may cause their legitimate (titles) to be acknowledged before the American tribunals. Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories, are those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th of May, 1846, and in Texas up to the 2d of March, 1836."

Counsel for appellant seem to contend that this clause in the protocol should be construed as establishing the proposition of law that unless a grant from the Mexican government to land situated in Texas was issued on or before the 2d of March, 1836, or was based upon an equity existing prior to that date, such title should not be upheld by ei-

ther the political or judicial department of either· the United States or of Texas. To the mind of the writer it is not clear that the clause referred to was intended to do more than declare the views of the United States government, and to indicate what would be its policy as to 'territory formerly owned by the Mexican government, and ceded by that treaty to the United States government. That at the time·the treaty was made it was the understanding of the United States government that it was not its province to undertake by treaty with Mexico to deal with and ·regulate titles in Texas is shown by the message of Pres. Polk in submitting the treaty of Guadalupe Hidalgo to the Senate for confirmation, and in which he recommended that the tenth article of the treaty as then submitted by Mexico be stricken out, which recommendation was unanimously adopted by the Senate. In that message the President said: "To the tenth article of the treaty there are serious objections, and no instructions given to Mr. Trist contemplated or authorized its insertion. The public lands within the limits of Texas belonged to that state, and this government has no power to dispose of them, or to change the condition of grants already made. All valid titles to lands within the other territories ceded to the United States will remain unaffected by the change of sovereignty; and I therefore submit that this article should not be ratified as a part of the treaty."

The article stricken out undertook to deal with Mexican land titles in Texas, and the fact that it was stricken out, presumably for the reasons assigned by the President, affords strong proof that it was not the intention ·of the government of the United States in making the treaty, or in the explanatory protocol to declare any rule of law by which the courts of Texas should determine the rights of individuals claiming lands in Texas under grants from Spain or Mexico. In fact, in McKinney v. Saviego, 18 How. 235, 15 L. Ed. 365, and Basse v. City of Brownsville, 154 U. S. 610, 14 Sup. Ct. 1195, 22 L. Ed. 420, the Supreme Court of the United States seems to have held that the treaty of Guadalupe Hidalgo had no relation to and did not affect property rights included within the state of Texas. In the former case, in construing the eighth article of the treaty, which makes provision for the protection of Mexicans and property rights in "territories formerly belonging to Mexico," it was held that the territories referred to had reference only to such territory as belonged to Mexico immediately before the making of the treaty in 1848, which territory was, by force of the treaty, ceded to the United States, and that it was not intended by the language used to include territory within the limits of Texas. That decision was approved and followed in the other case cited, and, if they were to be followed by the Texas courts, then it. seems to the writer, speaking for himself

only, that the protocol to the treaty can have no bearing in determining the validity of any titles in Texas, because the clause wherein Texas is mentioned is manifestly limited by its own terms to grants of lands made by Mexico in the ceded territories. Now, since the United States has acquiesced in the contention of Texas that its boundaries extended to the Rio Grande river and included the land here in controversy, then it would seem that that territory was not ceded to the government of the United States by the treaty. Therefore it seems to me that, if the question is not already concluded by former decisions of the Supreme Court of this state, the validity of the title under consideration should be determined without reference to any provision of the treaty referred to, and according to the laws and usages of nations applicable to grants made by a former government. However, this view has not heretofore prevailed in Texas, and our Supreme Court, as well as those of less authority, have considered the treaty of Guadalupe Hidalgo as applying to Spanish and Mexican grants in Texas. But we have been cited to no decision which holds that the effect of the protocol or any other portion of that instrument was to strike down and prevent the courts from upholding every title which had its origin after the 2d of March, 1836. Certainly no more importance can be attached to that date in determining the question of the validity of grants in Texas than to the 13th of May, 1846, the other date specified in the protocol in reference to former grants in California and New Mexico; and yet titles issued in California after that date and prior to the 7th day of July, 1846, when the United States army took possession of that territory, have been sustained by the federal authorities. Stearns v. United States, 73 U. S. 594, 18 L. Ed. 843; Hornsby v. United States, 10 Wall. 224, 19 L. Ed. 900; More v. Steinbach, 127 U. S. 70, 8 Sup. Ct. 1067, 32 L. Ed. 51; United States v. Pena, 175 U. S. 509, 20 Sup. Ct. 165, 44 L. Ed. 251. And the Supreme Court of Texas in Haynes v. State, 100 Tex. 426, 100 S. W. 912, held that a grant based upon a right which originated prior to the 19th day of December, 1836, was entitled to protection by the treaty of Guadalupe Hidalgo.

The Legislature of this state, the political department of the state government, in enacting the statute of 1860 and re-enacting it in 1870, providing for the confirmation of land titles in the territory of which the land in controversy is a part, authorized the confirmation of titles that were issued prior to the 19th day of December, 1836; that being the day on which the Congress of the Republic of Texas enacted a law, declaring that the Rio Grande river should constitute the boundary of Texas on the southwest. Laws 1836, p. 133. That legislation indicates that it was not the purpose of the political department of Texas to strike down and refuse to give countenance to every claim of land emanating from the government of Mexico which had its origin subsequent to the 2d of March, 1836. In view of this action by the legislative department of the state, when a Mexican title is asserted in the courts, not acting as special tribunals for the confirmation of titles under regulations prescribed by statute, but considering the law of nations, and all other laws applicable, should the courts lag behind the legislative department and adopt harsh constructions in order to defeat such titles? On the contrary, is it not more in accord with justice and sound public policy when, in the midst of conflicts between nations and governments, individuals, acting in good faith, have acquired rights under a de facto government that the courts of a succeeding government, as well as its political department, should render all reasonable aid in support of such rights?

In order to determine the merits of the title now under consideration, it is proper to consider the political situation at the time that title was acquired. Only a short time before that date, Texas was a political department of Mexico. The majority of her inhabitants, for reasons entirely sufficient, organized a revolution, which was carried to ultimate success by the defeat of the Mexican army and the capture of its general, who was also the President of Mexico, at the battle of San Jacinto on the 21st day of April, 1836. Up to that time, according to the weight of historical authority, the territory known as Texas was bounded on the south by the Nueces river, and was contiguous to the state or department of Tamaulipas in Mexico. See discussion of Boundary of Texas, in volume 17, p. 98, of the American Nation, a history, by Dr. Geo. P. Garrison, late professor of history in the University of Texas; also, discussion of the same subject by I. J. Cox, page 81 of volume 6, Texas Historical Quarterly; also, Fulmore's Geographical Map of Texas.

In May, 1836, Pres. Burnett and his cabinet, acting for Texas, and Gen. Santa Anna, who was then a prisoner of war, purporting to act for Mexico, signed two treaties, in one of which it was stipulated that the Mexican army should be withdrawn from Texas, and should go beyond the Rio Grande; and in the other it was stipulated that another treaty should be entered into at a subsequent date for the purpose, among others, of determining the limits of the two governments. Those treaties were subsequently repudiated by Mexico and Santa Anna; but if they were valid they did not determine, but left for future determination, the question of boundary between Texas and Mexico. In State v. Sais, 47 Tex. 309, it was declared by the Supreme Court, speaking through Chief Justice

Roberts, that: "The portion of Texas situated between the Rio Grande and Nueces rivers south of a line drawn from the northern boundary of Webb county to the mouth of Moros creek on the Nueces river was originally a part of the state of Tamaulipas in Mexico, whose capital was Victoria, some distance west of the Rio Grande. That the section of country was sparsely settled and was used principally for stock ranches; that it had long been subject to frequent depredations from savage Indians. On the 19th of December, 1836, an act of Congress of Texas was passed, defining the boundaries of Texas, in which that territory was included. Notwithstanding that, however, the state of Texas exercised no permanent jurisdiction over it, except along and near the Nueces river, including Corpus Christi on the Gulf, and the state of Tamaulipas exercised jurisdiction on and near the Rio Grande on the eastern side of it, until after the annexation of Texas to the United States, on the 29th of December, 1845, shortly after which armed occupation of the disputed territory was taken by the United States on behalf of Texas, since which time Texas has exercised jurisdiction over it." Authentic history seems to support the statement there made, and, such being the case, the status of the title under consideration seems to be this:

Prior to 1836 the boundary of Texas was the Nueces river, and Texas made no official claim of boundaries that would include any part of Tamaulipas until December 19, 1836, when her Congress declared that her boundaries extended to the Rio Grande river. Prior to that time and on November 9, 1836, the state of Tamaulipas, the government in possession and exercising jurisdiction over the land in question, sold it to those under whom the appellees claim, and on that day received the purchase money. Thereafter, in September, 1841, and before the asserted claim of Texas had been made good by actual occupancy of the United States army on behalf of Texas, the Mexican government, in confirmation of the sale previously made, issued the formal grant vesting title in the purchasers. Such being the facts, and considering the protocol to the treaty as applying to this case, we are of opinion that, if the title is good in other respects, the courts should not refuse to uphold it because of the treaty stipulation referred to. The sale was made before Texas had officially asserted any claim to the territory which embraces this land; and, while the formal grant was not issued until after that claim had been asserted by Texas, it was issued while the Mexican government was in actual possession and exercising actual jurisdiction over the land in question; and in the forum of conscience no reason can be assigned why the title should not be sustained. In other words, the territory in question was not in fact and law any part of the state of Texas until the claim of Texas had been made good by actual possession of the United States army and actual ouster of the possession and jurisdiction of the Mexican government, which did not occur until after the issuance of the final title. According to the laws and usages of nations, such a claim constitutes a valid title, which is not affected by a mere change of sovereignty. It may be conceded that the legislative department of the government could have enacted a law requiring such titles to be proved up and confirmed within a given time, and prescribed that a failure to procure such confirmation would render such titles null and void. But the Legislature of the state has not seen proper to pursue that course, and the courts have no right to prescribe such penalty.

But it is contended in appellant's supplemental brief, and suggested as fundamental error, that, at the time the sale in question was made, the Governor of Tamaulipas had no authority to make or order the sale, because it was not affirmatively shown that the sale was made with the previous approval of the supreme government. In support of that contention we are cited to pages 195 to 200, inclusive, of a volume entitled "Spanish and Mexican Land Laws," by Reynolds. The volume in question was compiled by Hon. Matthew G. Reynolds, United States Attorney for the Court of Private Land Claims, and we presume it is a correct compilation, and we copy therefrom the law referred to:

"Abolishes State Legislatures and Establishes Departmental Councils.

"Comp. Laws, Vol. III, page 75, No. 1626. "Law of October 3d, 1835.

"Article 1. The Governors who at present hold their offices in the states shall so continue, even when they have completed the terms previously established in their Constitutions, but subject in their continuance and in the exercise of their functions, to the supreme government of the nation.

"2. The Legislatures shall discontinue at once the exercise of their legislative functions; but before dissolving and after calling together those that have adjourned, they shall appoint a departmental board, composed for the present of five individuals selected from their own body or out of it, to act as the council of the Governor; in case this office is vacant, they shall propose to the supreme government such persons as have the qualifications that have been required heretofore; and until the government makes an appointment, they shall perform the functions of government through the first one of the laymen named.

"3. In the states where the Legislatures cannot assemble within eight days, the common council of the capital shall act in its

stead, solely for the purpose of electing the five members of the departmental council.

"4. All the judges and tribunals of the states, and the administration of justice, shall continue as heretofore until the law organizing this branch of the service is issued. The responsibility of the officials, which can be questioned only by the Congresses, shall be inquired into and determined by the supreme court of justice of the nation.

"5. All the subordinate employés of the states also shall continue for the present, but the places now vacant or that shall become vacant shall not be filled; and they, as well as the offices, revenues and branches of the service they manage, are subject to and at the disposal of the supreme government of the nation through the proper Governor.

"And that the hereinbefore inserted law may be fully and exactly complied with, in relation to the administration of the revenues of said states, his excellency, the President ad interim, has directed that the following regulations be observed:

"Article 1. As soon as the present regulations are received in every place where there are officers of revenue belonging to the states, the chiefs thereof shall prepare a cash account giving the branches of the service to which the receipts and disbursements belong, and showing the funds then on hand, which statements shall be signed by those responsible and examined by the Commissaries General or Subcommissaries, where there is one, and in the absence thereof by the first civil authority of the place.

"2. Said revenue offices shall also prepare, with the proper examination, a statement in which shall appear in detail the effects on hand belonging to the same, such as are tobacco, stamped paper and any others, stating the weight, number and size of the articles according to their class. They shall likewise prepare a separate inventory of the furniture and the belongings of the offices without excepting any; and another statement of the buildings the offices occupy, stating whether they belong to the state or are taken on lease, in which case the monthly rent paid shall be stated.

"3. Said offices shall also prepare a statement of the revenues they administer, of the debts they may have against themselves and their origin and of the collections that may be pending, with a statement of the terms in which they are to be collected, or whether these have already expired, giving the reason why they have not been collected. In regard to the matter of excises it shall be stated whether there are any individuals or towns that have entered into agreements in relation thereto (igualados), for what amounts and time and on what articles. The other offices of the state that administer revenues shall also prepare a nominal statement of the payments assigned to them, whether by the laws or by other orders, aggregating certified copies of whichever it may be and stating the condition said payments are now in.

"4. All the statements referred to in the foregoing articles shall be prepared in triplicate and forwarded to the Governor for him to transmit them to the supreme government through the Department of the Treasury which retaining one copy shall forward the other two to the directory and the Treasury General.

"5. The Governors shall order made an exact and detailed statement of each one of the revenues or branches of the service that constitute the exchequer of the state under their command, whether they arise from territorial property, rural or urban, or from monopolies or from direct or indirect taxes, the proceeds from which enter into their respective treasuries, together with copies of the laws, decrees or orders that created, organized or regulated said revenues.

"6. Said Governors shall cause to be made a statement giving the number of general and special revenue offices in the demarcation under their command, the functions of each office, the number of employés therein, the salaries they receive, the date and class of their several appointments, whether proprietary ad interim, or provisional, the vacancies there may be in each office, and in regard to the employés who should give bond for their administration it shall be stated whether their bonds are executed and the sufficiency of their bondsmen.

"7. The Governors shall forward to the Secretary of the Department of the Treasury in triplicate all the statements required by articles 5 and 6, as soon as they are prepared which shall be done in preference to everything else; they shall also be careful to send to said department those they receive from outside subordinate offices; shall make therein the necessary explanations, and said Governors shall see that said statements are forwarded with the greatest promptness and punctuality.

"8. Upon the receipt of the present regulations in every revenue office of the states, a statement of the accounts thereof shall be made and a minute so stating entered in their books of receipts and disbursements, which shall be signed by the person or persons responsible therefor and by the Commissary General or Subcommissary; and in the absence of both by the first civil authority of the place. Of the minute that may be made copies in triplicate certified to in like manner shall be forwarded to the Governor, which copies said Governor shall act upon as provided in the foregoing articles.

"9. The Commissaries General, Subcommissaries or the civil authorities of the places in their case, as soon as they have certified to the minute referred to in the preceding

135 S.W.—43

article, shall rubricate the following folios of the books and shall number them, if not already done, in order that the new account to be kept may be opened in the same, putting as a first entry the funds then on hand, until the supreme government with a knowledge of the books needed and in conformity with the orders that may be made in the matter, can order the transmittal of other new ones with the corresponding formalities.

"10. In everything relating to the Department of the Treasury the Governors and the respective officers shall proceed in accordance with the laws, regulations and orders of each state, in so far as may be compatible with the new organization of said revenues and until the General Congress adopts suitable measures for the future.

"11. The first days of each month there shall be prepared in all of said offices a cash account giving the receipts and expenses of each branch of the service and the amount of general funds then on hand, preparing also a statement of effects on hand in the form and with the examination provided in article 2 of these regulations and forward said statements in triplicate to the Governors, to be forwarded by them to the Department of the Treasury.

"12. Said Governors, in matters relating to the revenues, shall communicate directly with the supreme government through the Secretary of the Treasury, to whom they shall forward all documents and statements and consult when they consider necessary, being careful to cite the laws, orders and proceedings (expedientes) there may be on the matter.

"13. Until the attributes of the government and departmental boards, in what relates to the treasury, are declared by law, said Governors shall make no sales of lands (fincas) or property (bienes) nor contracts nor extraordinary expenses for said department, without the previous approval of the supreme government.

"14. The Governors, with a knowledge of the amount of revenues under their supervision and of the expenses by which they are affected, shall inform the supreme government as soon as possible of the amounts that may be computed monthly as balances for the general expenses, or those that are possibly lacking to meet them; to this end, they shall obtain the necessary instructions of the Commissaries General, and said Governors shall order that the net proceeds that result after paying the specific expenses of the administration of the revenues and such other lawful expenses as are provided for, be paid into the respective commissariat or subcommissariats at the end of each month or before, if necessary entering into an agreement to this end with the chiefs of said Commissaries General, and notifying the supreme government of each payment that shall be made, which shall be vouched for by the corresponding certificate.

"15. The supreme general government, though the Secretary of the Department of the Treasury, shall act on the documents, consultations and reports which it may receive from the Governors, and shall remit the first to the general department of revenues, or to the general treasury, according to the class to which they belong, for the proper uses, and in regard to the second shall hear said offices, according to their special attributes, for the instruction and determination of said matters.

"16. The general department of revenues and the general treasury, through the ministry of the treasury, shall communicate to the supreme government the opinions that result from the examination of the documents they receive, and shall make such examinations and rulings as are necessary, that the supreme government may make the proper orders and communicate them to the Governors."

It appears from the same volume that no law was enacted regulating the treasury department until April 17, 1837; and as there was no direct, affirmative proof of the previous approval of the supreme government, it is contended that the sale made by the alcalde of Reynosa under order of the Governor of Tamaulipas was void and vested no title or right in the purchasers. According to Bancroft's History, in 1834–35, Santa Anna was virtually Dictator in Mexico. It is true that the federal system of government continued in form until October 3, 1835, when the two houses of Congress formed themselves into a General Assembly, and issued the foregoing decree establishing a central government; but it does not appear that it was all enacted as a law by that or any other deliberative body. The first five articles may have been enacted by the Congress or Assembly; but those articles are followed immediately by certain regulations which it is stated are prescribed by the President ad interim, in order that the preceding law may be complied with in relation to the administration of the revenues of the different states. The regulations then proceed by numbers, and No. 13 reads thus: "Until the attributes of the government and departmental boards, in what relates to the treasury, are declared by law, said Governors shall make no sales of lands (fincas) or property (bienes) nor contracts nor extraordinary expenses for said department, without the previous approval of the supreme government." It will be observed that the first article of the law enacted by the Assembly continues the Governors of the respective states in office, but subject in their continuance and in the exercise of their functions to the supreme government of the nation. Concerning the regulation above quoted, three questions arise, and these are: First, is it any part of the law enacted by the Congress which had formed itself into an assembly, or is it merely a regulation prescribed by the acting president;

second, whether it derived its sanction from the one or the other source, was it intended as a limitation upon the powers theretofore vested in Governors to make sales of lands and other public property, or was it intended merely as instructions to Governors not to continue to exercise such powers without the previous approval of the supreme government; and, third, what was the supreme government? In other words, in what officer or officers was supreme authority vested?

Considering these questions in the order stated, it would seem from the plain and obvious reading of the document itself that it emanated from the President ad interim. There is nothing on the face of it to indicate that it was enacted by the Congress or Assembly, or that it emanated from any other source than the President. Was the President the supreme government, referred to in the act of the Assembly declaring that the Governors of the different states should continue in office, subject to the supreme government of the nation, and in the subsequent regulation prescribed by the President in reference to the sale of lands and other property? If so, it would seem that his authority was absolute and his will constituted the supreme law, an important circumstance to be kept in mind in determining the question of presumption in favor of the validity of the sale, which will be considered hereafter. But, aside from these questions, and considering together all the regulations prescribed by the President ad interim, it is by no means clear that it was intended by the thirteenth regulation set out above to limit the power formerly existing in Governors to effectuate sales of lands and other property belonging to the government; and, if doubt exists in that regard, such doubt should be resolved in favor of purchasers under sales made by authority of the Governors. The fact that the thirteenth regulation uses the language, "said Governors shall make no sales of lands," etc., is not conclusive evidence of the intention to limit authority. Instructions as to the mode and manner in which it is desired that power be exercised are often given by the use of the word "shall," when it is not intended to restrict the power itself or to render void the execution of the power in a different manner. In fact, the preceding regulation, which is No. 12, declares that Governors, "in matters relating to the revenues, shall communicate directly with the supreme government through the Secretary of the Treasury, to whom they shall forward all documents and statements, and consult when they consider necessary," etc. Yet if a Governor, in a particular matter, failed to communicate directly with the Secretary of the Treasury and sent his communication to the President, and the matter was afterwards considered and approved by the proper authority, would it be contended that the entire proceeding was void because the Governor had not communicated directly with the Secretary of the Treasury? Of course, no court would sustain such contention. Hence we conclude that the thirteenth regulation, however high was the authority from which it emanated, was not intended as a restriction upon the power to make sales, but as instructions not to exercise such powers without the approval of the supreme government until the happening of the contingency therein referred to.

But if we are wrong in the views just expressed, and if at the time the sale under consideration was made the Governor of Tamaulipas had no power to cause that sale to be made without the previous approval of the supreme government, we are of opinion that such approval should be presumed. In United States v. Peralta, 19 How. 343, 15 L. Ed. 678, the Supreme Court of the United States used this language: "The public acts of public officers purporting to be exercised in an official capacity and by public authority shall not be presumed to be usurped, but that a legitimate authority had been previously given or subsequently ratified. The presumption arising from the grant itself makes it prima facie evidence of the power of the officer making it, and throws the burden of proof on the party denying it." And in Strother v. Lucas, 12 Pet. 410, 9 L. Ed. 1137, the same court said: "The laws of Spain are the expressed will and pleasure of its monarch. If that will is expressed in any way—by a royal order, an ordinance, a decree of council, or an act of an authorized officer—if made or promulgated by the King, by his consent, or by his authority, it becomes, as to the person or subject-matter to which it relates, a law of the kingdom. And where an act is done contrary to a written order of the King it will be presumed that the act was done by virtue of a subsequent order known to the King or to his officers, though not to his subjects. In all public grants of lands, or acts of public officers in issuing warrants or orders of survey, permission to cultivate or improve as evidence of inceptive titles, such public acts of public officers, purporting to be exercised in an official capacity and by public authority, are presumed to have been done by legitimate authority, previously given or subsequently ratified."

If it be contended that those cases are different because the supreme authority in those cases was the will of an absolute monarch, which might be expressed in any form or manner, it may be replied that, in so far as we have been able to ascertain, it is not clear that the approval of the supreme government of Mexico for the sale now under consideration could not have been given in a very informal manner. At any rate, we have been cited to no law, and have found none, that required such approval to appear in the expediente, or to be in any particular form, or even in writing. Our own Supreme

Court has frequently dealt with the question as to the presumption in favor of authority of an officer granting land. In Jones v. Garza, 11 Tex. 186, the plaintiff relied on a grant issued in 1824, when the laws of Spain were in force, by the Vocal Primero of the Most Illustrious Deputation and Political Chief ad interim of the Province of Texas. The objection was urged that the grant was void for the want of authority in the officer by whom it was executed, and the court held that, in the absence of evidence as to the powers of an officer, the presumption existed that he acted within the scope of his legitimate powers, but that presumption would yield to evidence showing that the authority exercised did not belong to the office. No written law was produced in relation to the powers of that officer; but a witness familiar with the contemporaneous acts of the then government testified that a Political Chief had no authority to make grants of land, and from this testimony the grant was held to be void. Similar rulings were made in Norton v. Mitchell, 13 Tex. 47; Holliday v. Harvey, 39 Tex. 671. There was a second action brought upon the title involved in Jones v. Garza, and the case was again decided by the Supreme Court (Jones v. Muisbach, 26 Tex. 235), and the court reaffirmed its former decision, and in the course of the opinion said: "The correct rule, as recognized by this and every other court, unquestionably is that, where an officer of well-known, defined, and limited powers performs an act at variance with or beyond the scope of his usual authority, the burden of proving its validity rests upon the party seeking to sustain it. Otherwise the party seeking to overthrow such presumption would be forced to prove a negative."

In Railway v. Jarvis, 69 Tex. 541, 7 S. W. 217, the court again recognized the doctrine of presumed authority, and we make the following excerpt from the opinion in that case: "The court, in effect, found the facts as we have stated them, and thence held that the land was granted by the government of Spain in the year 1767, and was, therefore, not subject to location. The facts shown by the instrument to which we have before referred show. that all the steps necessary to the making of valid grants were taken, except, it may be, that the acts of the subdelegates were confirmed by the viceroy. If the instrument were entire this fact most probably, if it were necessary to valid title, would appear; and, in view of the long possession and open assertion of title under it and the failure of three governments for more than a century to deny the right asserted, we are of the opinion that it must be presumed that valid grants were made as the defendants claim, and that the acts of the subdelegates were confirmed by the viceroy. The rules applicable to this question are well settled, and there is nothing in the facts of this case to deny their application."

Counsel for appellant cite and rely on Goode v. McQueen's Heirs, 3 Tex. 241, in which the Supreme Court held that, as the government of Mexico had withdrawn from colonization and settlement all lands within a specified distance of the border, without the previous approbation of the supreme government, such approbation would not be presumed, but must be affirmatively shown in order to sustain the validity of a title issued within the territory referred to. The decree or statute construed in that case related to a question of public policy, and therefore that case can be distinguished from the later cases referred to above and decided by the same court. If it cannot, then it should not be regarded as binding authority in this case.

In United States v. Arredondo, 6 Pet. 691, 8 L. Ed. 547, a title had been issued by Don Alexandre Ramirez, styling himself Intendente of the Army, Subdelegate, Superintendent General of the Royal Domain of the Island of Cuba and the two Floridas, etc., and it was held by the court that the authority of that officer to make the grant would be presumed. Among other reasons given for that conclusion was the fact that the Congress of the United States, in several different laws providing for the confirmation of titles claimed to have been issued by former governments, had not required the tribunals authorized to investigate such claims to inquire into the authority of the officer who had issued the title. In this state several different statutes have been enacted providing for the confirmation of titles emanating from the Spanish and Mexican governments, and in that respect they appear to be quite similar to the federal statutes referred to in that case; and, for that reason, we think the courts can well assume, as did the Supreme Court in the Arredondo Case in reference to the federal Congress, that it was the intention of the legislative department that a title purporting to have been issued by Spanish or Mexican authority, if not shown to be fraudulent, would constitute at least prima facie evidence of title.

It is true that the act of Congress creating the Court of Private Land Claims, which was subsequently enacted, was so framed as to require a different construction of that statute, as was held in Hayes v. United States, 170 U. S. 637, 18 Sup. Ct. 735, 42 L. Ed. 1174. But even in a proceeding under that statute it was held by the same court, in Ely v. United States, 171 U. S. 220, 18 Sup. Ct. 840, 43 L. Ed. 142, that, while the act required a claimant to show that his title was issued by an officer having authority to issue it, yet when it was shown that the officer who issued a particular grant was in the habit of exercising that power, and that his acts in so doing had been recognized by the Mexican government as valid,

his authority to issue such titles may be presumed. It is not denied by counsel for the state in this case that, prior and subsequent to the issuance of the title under consideration, alcaldes, acting under authority and direction of the Governors, issued titles in various states of Mexico, and that such titles have been recognized as valid by that government. In fact, there was evidence submitted in this case tending to show affirmatively that the Mexican government has acquiesced in the validity of the title here involved, in so far as it relates to that portion of the commons of Old Reynosa located on the Mexican side of the Rio Grande.

The case of Faxon v. United States, 171 U. S. 244, 18 Sup. Ct. 849, 43 L. Ed. 151, relied on by counsel for appellant, does not support the proposition that when a court of general jurisdiction, unrestricted by a statute, is passing upon the validity of a title based upon an alleged grant from a former government, the authority of the officer issuing the title may not be presumed. In that case the appellant sought to have his title confirmed under the statute creating the Court of Private Land Claims referred to and construed in the Hayes Case, supra; and it was there held that, because of the peculiar wording of that statute, in order to entitle him to confirmation of his title Faxon must make it appear, not merely that his title was regular in form, but that the official body or person assuming to make the grant was vested with authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified. It was held in that case, as had been previously held in United States v. Coe, 170 U. S. 681, 18 Sup. Ct. 745, 42 L. Ed. 1195, that when a claimant pleaded a title issued by a particular officer, and it appeared from the laws of Mexico in force at the time that the power to issue such titles was vested in another and different officer or body, the claimant was not entitled to have his title confirmed.

In view of what has already been said, and of the fact of the long-continued possession and use under the title asserted, and the long acquiescence therein by three governments, we are of opinion that, if the previous approval of the supreme government of Mexico was necessary to the validity of the sale under which appellees claim, such approval should be presumed.

It is also contended on behalf of the state that, if the title referred to ever had any validity, it became null and void because of the failure to comply with the act of February 10, 1852. The act referred to, omitting formal parts, reads as follows: "That the field notes of all surveys made previous to the passage of this act shall be made out and returned in the manner now required by law to the General Land Office on or before the 31st day of August, 1853, or they shall become null and void, and the said surveys shall become vacant land and be subject to be relocated and surveyed as in other cases by any person holding a genuine land certificate or other legal evidence of claim to land."

In our opinion that act had reference to surveys of land made under and by authority of laws enacted by the republic or state of Texas, and had no reference and was not intended to apply to titles that had been previously granted by the Spanish or Mexican government. No doubt the reason of its enactment was the fact that many certificates had been located on lands in different portions of the state, the field notes of which had not been returned to the General Land Office, and it was deemed unwise by the Legislature to permit that condition of affairs to continue and increase indefinitely. No patent or final title could be issued upon such locations until the field notes were returned to the General Land Office; and, no doubt, the Legislature thought that if the mere location of a certificate upon a particular tract of land, without the return of the field notes to the Land Office, could withdraw that tract of land from the public domain for an indefinite length of time, great confusion and hardship would result, and the purpose of that statute was to remedy that evil. We find nothing in its context or language to indicate that it was intended to strike down a final title that had already been issued by a former government. If such had been the purpose, no reason is perceived why the Legislature would not have required the title itself to be recorded in the Land Office, and not merely the field notes.

This case has been given long and careful consideration, and our conclusion is that the trial court decided it correctly as between the state and the contesting defendants. As before said, we think the court erred in not rendering judgment for the state against the defendants who failed to answer; and, in that respect, and to that extent only, the judgment will here be reversed and rendered for appellant, and in all other respects it will be affirmed.

In part reversed and rendered, and in part affirmed.