## STATE OF TEXAS v. JOSE L. GALLARDO ET AL.

### No. 2296.    Decided April 29, 1914.

1.—Grant—Sale of Public Land—Presumption of Authority.

The consent of the Supreme Government to a sale of public land by order of the Governor of a Mexican State, his general authority therefor being recognized by law but made subject to a temporary regulation requiring the previous approval of such Supreme Government, may be presumed in favor of the regularity of such official act. (Pp. 285, 286.)

2.—Same—Case Stated.

A town in the State of Tamaulipas, in the Republic of Mexico, situated on the Rio Grande, had received from the Kingdom of Spain, in 1767, a grant of "ejidos," town commons, lying on both sides of the river. Subsequently the site of the town was removed to a point on the river six leagues away. Later, in 1836, while the State of Tamaulipas was still in actual control, and before the Republic of Texas had asserted its sovereignty to the Rio Grande (Act of Dec. 19, 1836), the "ejidos" was sold to private purchasers under an order of the Governor of Tamaulipas. Under the law of Mexico (October 3, 1835) and regulations in pursuance thereof by its General Government (at that time the Dictatorship of Santa Anna) the Governor was then prohibited from making sales of lands "without the previous approval of the Supreme Government." Held that such approval of this sale might be presumed; especially in view of the long lapse of years, of the fact that it did not appear but that the approval might be given in a purely informal manner, of proof of acquiescence by the Mexican Government in such sale as to so much of the town commons as lay on the Mexican side, and of long continued possession and claim under the purchasers at such sale, who were shown to have paid the price bid thereat, and of recognition on the part of Texas in its General Land Office of this as being granted land, the State first asserting title by suit against those claiming under such sale brought in 1908. (Pp. 282-286.)

**3.—Power of Governor to Sell.**

The prohibition of sales of land by the Governors of States without previous approval of the Supreme Government was a recognition of their power to sell with such approval. (Pp. 284, 285.)

**4.—Res Adjudicata.**

A judgment in favor of the State in an action brought against it for obtaining confirmation of a title granted by a former government, in pursuance of an Act permitting such suit, did not conclude adversely the title of others claiming under the same grant but not under or in privity with the plaintiff. (P. 286.)

**5.—Grant by Former Government—Return of Field Notes.**

The Act of February 10, 1852, Laws, 4th Leg., p. 58, requiring return to the General Land Office of field notes of all surveys previously made, did not apply to titles issued by a former government which upon just principles were entitled to be upheld by the courts of this State. (Pp. 286, 287.)

**6.—Spanish Law—Town Commons—Title.**

Under Spanish Law the grant of lands to a town as commons conveyed no title in fee to the municipality or its inhabitants. Upon the abandonment of their public use they reverted to the Sovereign. Upon the removal of the municipality to another site such inhabitants as remained or others continuing to occupy such lands held no title under the original grant thereof as municipal commons. (Pp. 287, 288.)

**7.—Grant by Former Government—Treaty Rights.**

A title to lands within the original Mexican State of Tamaulipas and the present boundaries of Texas which was good as against the Mexican Government on December 19, 1836, the date of the Act of the Congress of the Republic defining the boundaries of Texas, so as to include that territory, is within the protection of the Treaty of Guadalupe Hidalgo. (P. 288.)

**8.—Same—Title to Mexican Lands.**

Sale of "Los Ejidos," the land granted by the Kingdom of Spain to the town of Reynosa, in the State of Tamaulipas, in 1767,—that town having been removed to another site,—was made under order of the Governor of that State on October 5, 1836, including land over which Texas claimed to extend its boundaries and jurisdiction by Act of December 19, 1836, but which remained in the possession and control of Tamaulipas until 1846. The purchase money was paid; the land had been for forty or fifty years in possession of those claiming under this sale; taxes were paid on it by some of such claimants. since 1879; the grant was notorious, and capable of identification by survey; its validity, as to the portion on the Mexican side of the river had been recognized by the acquiescence of the Mexican Government; the part in Texas had been designated on the maps of the General Land Office, which had recognized it as titled land; in making the grant a survey of the land was ordered and made in 1841, and title was then issued from the State of Tamaulipas by execution of a testimonio by the Alcalde · making the sale. Held, that the title· was so far a matured and perfected one at the date of the Treaty of Guadalupe Hidalgo (1848, 7 Fed. Stats., Annotated, 702, 703) as to be under its protection, and the grantees acquired a right to the land as against the State of Texas; that, if considered merely an imperfect and unconfirmed title at that date, it presented such an equitable right as to entitle it to recognition. Haynes. v. State, 100 Texas, 426, followed. (Pp. 289-292.)

**9.—Same—Survey.**

The land sold being capable of identification, a survey of same was not necessary in order to establish the right of the purchaser to receive title. If the extension of the final title after survey be held invalid because of the claim of Texas to jurisdiction over the land at that time, the order of the Alcalde

for a survey before title be executed was, for the same reason, without authority or effect on the purchaser's rights.   (Pp. 289, 290.)

Error to the Court of Civil Appeals, Third District, in an appeal from Travis County.

The State sued Gallardo and others in trespass to try title.   Judgment for defendants was, on plaintiff's appeal, affirmed in part, and in part reversed and rendered.   Appellant then obtained a writ of error.

*Jewell P. Lightfoot,* Attorney General, and *L. A. Dale,* Assistant; *J. D. Walthall,* Attorney General, and *John L. Terrell,* Assistant; *B. F. Looney,* Attorney General, and *G. B. Smedley,* Assistant, for plaintiff in error (*L. D. Brooks* also filed argument by permission as *amicus curiae*).—The judgment rendered by the District Court of Travis County, entitled "No. 3138, Noberto Garza et al. v. State of Texas," for confirmation of the title of the ninety-five persons named therein to the land involved in this suit was a proceeding in rem and was conclusive and binding in this cause on said ninety-five persons and on all persons claiming said land or any part of same by or under them or any of them, for whose benefit said former suit was brought and tried.   Act of February 8, 1850, vol. 3, p. 582, Gammel's Laws; Act of August 15, 1870, vol. 6, pp. 375-378, Gammel's Laws; Botiller v. Dominguez, 130 U. S., 238; Barker v. Harvey, 181 U. S., 481; sec. 11, Acts First Called Session of Texas Legislature, 1901, p. 4; State v. Ortiz, 99 Texas, 475; Hardy v. Beaty, 84 Texas, 568; Car v. Welborn, Dal., 629.

No imperfect title emanating from a former, and unrecognized by the existing government, has any standing in any court of justice until the political authority of the State gives it standing.   The duty of protecting equitable rights of property in ceded territory under treaty provisions, which were in existence at the time of such cession, rests upon the political, and not the judicial department of the government, and the courts can exercise jurisdiction in giving such protection to the extent only that the political authority of the government has vested them with authority to determine and to protect such rights.   Art. 14 of the Act of Consultation, closing the Land Office of Texas, of date November 13, 1835, vol. 1, pp. 541-542, and pp. 912-913, Gammel's Laws; Declaration of Texas Independence, March 2, 1836, vol. 1, p. 1063, Gammel's Laws; sec. 9, art. 6, of the Constitution of the Republic of Texas, adopted March 17, 1836, Gammel's Laws, vol. 1, p. 1076; sec. 10 of the general provisions of the Constitution of the Republic of Texas of 1836, vol. 1, pp. 1080-1081, Gammel's Laws, suspending the operation of the Land Office (the latter part of said section); Battle of San Jacinto, April 21, 1836; Treaty of Velasco, made May 14, 1836, pp. 24, 26 of the Journals of the House of Representatives of the First Congress of the Republic of Texas; evacuation of Texas by the Mexican army on June 18, 1836, in accordance with the terms and stipulations of said treaty of Velasco.   See Bancroft's Works, vol. XVI, North Mexican States and Texas, chap. XII, pp. 279-282; sec. 1 of an Act of Congress of the Re-

public of Texas, entitled "An Act to define the boundaries of the Republic of Texas." Approved December 19, 1836, vol. 1, pp. 1193-1194, Gammel's Laws; Acts First Special Session of Texas Legislature of 1901, p. 4; Paschal v. Perez, 7 Texas, 348; Commissioners v. Bell, Dallam, 366; Hosner v. DeYoung, 1 Texas, 764; Trimble v. Smithers, 1 Texas, 790; League v. DeYoung, 2 Texas, 497; Kemper v. Corporation of Victoria, 3 Texas, 135; McMullen v. Hodge, 5 Texas, 34; Jones v. Borden, 5 Texas, 410; Hancock v. McKinney, 7 Texas, 384; Paschal v. Dangerfield, 37 Texas, 273; Haynes v. State, 85 S. W., 1029; Astizarian v. Mining Co., 148 U. S., 81; United States v. Santa Fe, 165 U. S., 675; United States v. Sandoval, 167 U. S., 278; Ainsa v. United States, 167 U. S., 208; McKinney v. Saviego, 18 Howard, 235; Bassie v. Brownsville, 87 U. S., 420; proctocal in lieu of suppressed article 10 of the Treaty of Guadalupe Hidalgo, see Barker v. Harvey, 181 U. S., 481; City of Brownsville v. Basse & Hord, 36 Texas, 461; Blair v. Odin, 3 Texas, 288.

After October 3, 1835, governors of departments of Mexico had no authority to sell or cause to be sold lands which pertained to the Treasury without having first obtained the approval of the supreme government of Mexico. After May 16, 1836, governors of departments of Mexico had no authority to sell or cause to be sold any lands which pertained to the Treasury of Mexico, neither with nor without the previous approval of the supreme government of Mexico of such proposed sale. On November 9, 1836, the governor of the department of Tamaulipas, Mexico, had no authority under the laws of Mexico to sell or cause to be sold the lands involved in this suit. On November 9, 1836, the governor of the department of Tamaulipas, Mexico, neither of his sole authority nor with the advice of the departmental council, had authority under the law of Mexico to sell or cause to be sold the land involved in this suit. No sale or purchase of land made on account of the Treasury on November 9, 1836, and not made by the commissaries general while sitting as a board of sale was a valid sale or purchase of said land as against the State of Texas. Law of October 3, 1835, abolishing State Legislatures and establishing departmental councils, Reynolds' Spanish and Mexican Land Laws (especially art. 2 of said law, and sec. 13 of the regulations made under said law), pp. 195-199; circular of the Treasury Department of date May 16, 1836, calling attention to the treasury regulations of July 20, 1831, requiring punctual compliance with articles 126 to 134 of said regulations, Reynolds' Spanish and Mexican Land Laws, p. 202; treasury regulations, decree of July 20, 1831, referred to in said circular, Reynolds' Spanish and Mexican Land Laws, pp. 157-161 (especially arts. 126 and 133 of said regulations on pp. 158 and 160); subdivision 2, title 4, sec. 4 of art. 110 of the Federal Constitution of the United Mexican States, sanctioned by the General Constitutive Act of Congress on the 4th day of October, 1824 (Gammel's Laws, vol. 1, pp. 66 and 85); art. 17 of the Constitution of December 29, 1836, defining the powers of the President of the Republic of Mexico. (Reynolds' Spanish and Mexican Land Laws, p. 203.)

The approval by the supreme government of the sale by order of the

Governor of Tamaulipas can not be presumed. Subdivision 2, title 4, sec. 4, of art. 110 of the Federal Constitution of the United Mexican States, sanctioned by the general constituent Act of Congress on the 4th ·day of October, 1824, Gammel's Laws, vol. 1, pp. 66 and 85; Jones v. Muisbach, 26 Texas, 236; Goode v. McQueen's Heirs, 3 Texas, 241; Republic v. Thorn, 3 Texas, 499; Edwards v. Davis, 3 Texas, 320; Smith v. Power, 14 Texas, 145; March v. Weir, 21 Texas, 97; Smith v. Power, 23 Texas, 29; Wilcox v. Chambers, 26 Texas, 180; United States v. Knight's Admr., 1 Black, 227; United States v. Coe, 170 U. S., 681; United States v. Coe, 174 U. S., 578; Faxon v. United States, 171 U. S., 244; Decree of July 20, 1831, especially arts. 126 and 133 of said decree (p. 157 Reynolds); Comp. Laws, vol. 111, p. 75, No. 1626, Laws of October 3, 1835 (Reynolds' Laws, pp. 195 to 200, inclusive); Comp. Laws, vol. 111, p. 162, No. 1735 (Reynolds' Laws, p. 202); Comp. Laws, vol. 111, p. 89, No. 1637, Laws of October 23, 1835 (Reynolds' Laws, p. 201); Comp. Laws, vol. 111, p. 280, No. 1806; Decree of December 29, 1836 (Reynolds' Laws, p. 203 to 208, inclusive, ·especially art. 111, on p. 208); Comp. Laws, vol. 111, p. 258, No. 1807; Laws of December 30, 1836 (Reynolds' Laws, p. 209); Comp. Laws, ·vol. 111, p. 260, No. 1811; Laws of January 17, 1837 (Reynolds' Laws), ·p. 210; Comp. Laws, vol. 111, p. 323, No. 1839; Law of March 20, 1837 (Reynolds' Laws, pp. 211 to 221, inclusive); Comp. Laws, vol. 111, p. 352, No. 1847; Law of April 4, 1837 (Reynolds' Laws, p. 222).

A survey of land made prior to the 10th day of February, 1852, the field notes of which were not returned to the General Land Office ·on or before the 31st day of August, 1853, as required by section 1 of an Act entitled "An Act concerning surveys of land, approved February 10, 1852," is null and void. Art. 4 of the Act of Consultation, closing the Land Office November 13, 1835, Gammel's Laws, vol. 1, pp. 912-913; sec. 10 of the general provisions of the Constitution of the Republic of Texas, adopted March 17, 1836; sec. 1 of an Act of the Congress of the Republic of Texas entitled an Act to provide for the return of surveys, for the collection of government dues on lands, and for other purposes, approved February 5, 1840; joint resolution approved December 10, 1840, giving further time of twelve months for payment of government dues and return of field notes to the General Land Office on all lands surveyed by virtue of certificates issued by the board of land commissioners created by the laws of the Republic; sec. 1 of art. 12 of the Constitution of 1845; joint resolution approved June 20, 1845, providing that the provisions of a joint resolution approved November 27, 1841, giving further time for the payment of government dues and return of field notes be declared in effect until the first day of January, 1848; secs. 1 and 4 of an Act entitled "An Act concerning surveys of land, approved February 10, 1852." (Gammel's Laws, vol. 3, pp. 936-937; sec. 21 of art. 7 of the Constitution of 1845; sec. 2 of art. 10 of the Constitution of 1869; sec. 5 of art. 13 of the Constitution of 1876; Dobbins v. Bryan, 5 Texas, 276; Botilla v. Dominguez, 130 U. S., 238; Barker v. Harvey, 181 U. S., 481; sec. 11 of an Act of the First Called

Session of the 27th Legislature, which provided for testing the validity of Spanish and Mexican land grants, approved September 3, 1901; art. 4145 of Rev. Civ. Stats. (Sayles); joint resolution to suspend the operation of the Land Office until the further action of Congress, vol. 1, p. 1345, Gammel's Laws; McKinney v. Saviego, 18 How., 235; Bassie v. City of Brownsville, 87 U. S., 420, L. ed.; sec. 6 of an Act supplementary to establishment of Land Office for the Republic of Texas, passed June, 1837. (Gammel's Laws, vol. 1, p. 1324.)

The governor of the department of Tamaulipas had no power or authority on November 9, 1836, either with or without the advice or consent of the Departmental Council, to sell or cause to be sold any land on account of the Mexican Treasury, and any title to lands in this State acquired by purchase at any such sale is invalid as against the State of Texas. The order of the President of Mexico on May 16, 1836, had the effect to take from governors of departments all authority conferred upon them by article 13 of the regulations of October 3, 1835, to make, or cause to be made, sales of land which pertain to the Treasury, if any such authority was so conferred. All locations and surveys of public lands within the present limits of the State of Texas made since November 13, 1835, and all sales of such lands made since March 17, 1836, which were not made in the name and by the authority of either the Republic or the State of Texas, are invalid as against the State, unless the political authority of the Republic or of the State of Texas has recognized the same. Subdivisions 2 and 19, art. 110, Constitution of Mexico, defining powers of the President, etc., Gammel's Laws, vol. 1, pp. 85, 86 (bottom paging); subdivision 1, art. 116, Constitution of Mexico, defining the attributes of the Council, Gammel's Laws, vol. 1, p. 87; art. 165, Constitution of Mexico, Congress alone to interpret the Constitution, Gammel's Laws, vol. 1, p. 93; subdivision 4 of art. 38, and arts. 39 and 40, Constitution of Mexico, functions of the Chambers, etc., Gammel's Laws, vol. 1, p. 76; subdivision 14, art. 16, Constitutive Acts of the Mexican Confederation, powers of the Executive, Gammel's Laws, vol. 1, p. 64; art. 172, Constitution of Coahuila and Texas, courts shall never interpret the law, Gammel's Laws, vol. 1, p. 447; arts. 126 to 134, Treasury Regulations of July 20, 1831, Reynolds' Spanish and Mexican Land Laws, pp. 158 to 160; circular Treasury Department calling attention to above regulations, Reynolds, p. 202; Constitutional Law, defining powers of President of Mexico, Reynolds, p. 203; art. 2 of Mexican Law of 1835, Legislatures discontinued, Reynolds, p. 195; art. 13, regulations under above law, Reynolds, p. 199; sec. 21, art. 7, Constitution Republic of Texas, 1845, Gammel's Laws, vol. 2, p. 1294; sec. 9, art. 6, Constitution Republic of Texas, 1836, Gammel's Laws, vol. 1, p. 1076; sec. 10 of General Provisions of Constitution of the Republic of Texas, 1836 (latter part), Gammel's Laws, vol. 1, p. 1081; art. 14, Act of Consultation of Texas, November 13, 1835, closing Land Office, Gammel's Laws, vol. 1, p. 541; Declaration of Texas Independence, March 2, 1836, Gammel's Laws, vol. 1, pp. 1063-1067; Battle of San Jacinto fought April 21, 1836; Treaty of Velasco, May 14, 1836, pp. 24-26 of

the Journals of the House of Representatives of the First Congress of the Republic of Texas in 1836; evacuation of Texas by Mexican army, crossing Rio Grande, June 18, 1836, Bancroft, vol. 16, pp. 279-282; Act of Congress, Republic of Texas, defining its boundaries, Gammel's Laws, vol. 1, p. 1193; sec. 5, Act of Congress, Republic of Texas, in re General Land Office, etc., Gammel's Laws, vol. 1, p. 1324; protocol to Treaty of Guadalupe Hidalgo, Treaties and Conventions, State Library, No. "341-273 NN. 31"; secs. 1 and 2, art. 10, Constitution of Texas of 1869, Gammel's Laws, vol. 7, p. 419; sec. 5, art. 13, Constitution of Texas, 1876; Donaldson v. Dodd, 12 Texas, 381; Emmons v. Oldham, 12 Texas, 19; Rivers v. Foote, 11 Texas, 662; Lewis v. Durst, 10 Texas, 398; Peacock v. Hammond, 6 Texas, 544; Blair v. Odin, 3 Texas, 288; Board of Land Commissioners v. Bell, Dallam, 366; Houston v. Robertson, 2 Texas, 25-28; Paschal v. Perez, 7 Texas, 348; State v. Delesdenier, 7 Texas, 76; McKinney v. Saviego, 18 Howard, 235; Bassie v. Brownsville, 87 U. S., 420, L. ed.; City of Brownsville v. Basse, 36 Texas, 461; United States v. Coe, 170 U. S., 681; United States v. Coe, 174 U. S., 578; Hays v. United States, 170 U. S., 637; Faxon v. United States, 171 U. S., 244.

The fee in such town commons remained in the sovereign, and only the use of such lands was granted to the town for the benefit of its inhabitants, and upon the abandonment of the town the use of such lands reverted to the sovereign or granting power. Townsend v. Greely, 5 Wall., 326; United States v. Pico, 5 Wall., 536; Grisor v. McDowell, 6 Wall., 363; Faxon v. United States, 171 U. S., 244; Dittmar v. Dignowitty, 78 Texas, 22; United States v. Sandoval, 167 U. S., 278.

*Frank C. Pierce,* for defendants in error Santos' Saner and others; *Duval West,* for defendant in error Yoakum Land & Irr. Co.; *Jas. B. Wells,* for defendants in error Charles Schunior and others; *D. B. Chapin, Clark & Bliss,* and *Charles Rogan,* for defendants in error Jose L. Gallardo and others.—None of appellees and none of those under whom appellees claim having been a party to the suit of Noberto Garza v. The State of Texas, the judgment rendered in said suit is not binding upon them and can not constitute an estoppel as against any of appellees. Trawick v. Harris, 8 Texas, 312; Bertrand v. Bingham, 13 Texas, 266; Lockhart v. Ward, 45 Texas, 227; Woolley v. Sullivan, 92 Texas, 28; chap. 83, Acts of the 12th Leg., vol. 6, pp. 201 to 204, Gammel's Laws of Texas; Railway Co. v. Jarvis, 69 Texas, 527; State v. Cardinas, 47 Texas, 250; Tex. Mex. Ry. Co. v. Locke, 74 Texas, 270.

The title that was vested by the said grant made by the government of Spain in the town of Old Reynosa for the benefit of the inhabitants thereof was, under the Spanish law, a perfect title for the uses and purposes set forth in the grant, and was not an inchoate defeasible title. Alvarez, Derecho Real de Espana, vol. 1, pp. 138-139; Institutes of the Civil Law of Spain, De Asso y Del Rio and De Manuel y Rodriguez, contained in White's New Recopilacion, vol. 2, p. 77; Law I, title 16, Lib. 7, Civil Laws of Spain and France, as set forth in White's Recopi-

lacion, vol. 2, p. 100; Law 2, title 21, Lib. 7, of the Civil Laws of Spain and France, as set forth in White's Recopilacion, vol. 2, p. 111; Law 3, title 21, Lib. 7, of the Civil Laws of Spain and France as set forth in White's Recopilacion, vol. 2, p. 112; Law 4, title 21, Lib. 7, White's Recopilacion, vol. 2, p. 112; Law 5, title 21, Lib. 7, White's Recopilacion, vol. 2, p. 113; Law 6, title 21, Lib. 7, White's Recopilacion, vol. 2, pp. 115, 116; Law 8, title 21, Lib. 7, White's Recopilacion, vol. 2, p. 117; Law 9, title 21, Lib. 7, White's Recopilacion, vol. 2, p. 118.

The State of Tamaulipas in the exercise of its power as a sovereign had the right to reduce to individual ownership the lands owned in common by the inhabitants of Old Reynosa while such lands were under the dominion of said State. Chambers v. Fisk, 22 Texas, 504.

By the acceptance by the duly constituted authority of the bid made by Fruto de Cardenas of $210 in his own behalf and the others of the ninety-six purchasers and by the actual payment of said bid on the 9th day of November, 1836, such purchasers acquired at least a complete and perfect equitable title to the lands in controversy in this suit in private ownership even if it should be held that the execution and delivery of a formal deed was necessary to vest in them the legal title. Haynes v. State, 100 Texas, 426; Garza v. State, 64 Texas, 670; State v. Sais, 47 Texas, 307.

The title acquired in individual ownership of the lands in controversy in this suit by the sale of said lands under the order of the government of Tamaulipas, such sale having been consummated and the purchase price having been fully paid by such purchasers prior to December 19, 1836, is protected by the treaty of Guadalupe Hidalgo made between the United States and the Republic of Mexico in 1848. Haynes v. State, 100 Texas, 426; State v. Sais, 47 Texas, 307; Clark v. Hills, 67 Texas, 141; State v. Bustamente, 47 Texas, 322; Trevino v. Fernandez, 13 Texas, 630; Daniel v. Hutcheson, 86 Texas, 51; Martin v. Weyman, 26 Texas, 460.

If the title vested by the grant of the Spanish government in the town of Reynosa for the benefit of the inhabitants thereof was lost by abandonment, and had reverted to the Spanish government, and had thus passed to the government of Mexico when Mexico became independent, still the sale under the order of the departmental government of the State of Tamaulipas would be a valid sale; and such sale having been perfected by payment of the purchase money prior to the date when the Republic of Texas asserted title to the territory between the Nueces and Rio Grande, and nothing remaining to be done except the formal execution of a deed, such title was a perfect title. Haynes v. State, 100 Texas, 426; also authorities last above cited.

If the order of Santa Anna, the usurping dictator, had the effect to take away from the State of Tamaulipas the power to sell any portion of public domain situated within said State without the previous approval of the dictator's government, then, since the sale was made by a government purporting to be the departmental government of Tamaulipas, that is to say, a tribunal acting under and as a part of the dictator's

government, it will be presumed that the departmental governor acted in accordance with the orders and instructions of his superiors and that before making the order to sell the land he had procured the approval of his superiors. Sheldon v. Milmo, 90 Texas, 1; Jones v. Garza, 11 Texas, 186; Hancock v. McKinney, 7 Texas, 384; Holliman v. Peebles, 1 Texas, 699; Jenkins v. Chambers, 9 Texas, 167; United States v. Peralta, 19 How., 343.

MR. JUSTICE PHILLIPS delivered the opinion of the court.

The suit was an action by the State in trespass to try title against Jose L. Gallardo and numerous other defendants, to recover two leagues of land in Hidalgo County, referred to in the petition as all of the certain tract known as "Los Ejidos" that lies on the north side of the Rio Grande River. W. A. Boswell, L. D. Brooks, J. P. McDonald and F. Spaeth were included as defendants under an allegation that they were asserting some character of claim to the land, which, according to their answer, was a claim of right to have the land awarded them by the State based upon applications to purchase. Against several of the defendants who had not answered an interlocutory judgment by default was rendered. On the trial judgment was rendered against the State and in favor of all the defendants except Boswell, Brooks, McDonald and Spaeth, as to whom the suit was dismissed upon the court's finding that the State had never had any title to the land, and, accordingly, there was no issue between them and the State to be determined. On the appeal of the State the judgment was in all respects affirmed by the Honorable Court of Civil Appeals, except as to the defendants who had not answered; the judgment being reversed in that respect and rendered for the State.

The findings of the Court of Civil Appeals set forth in the able and exhaustive opinion of Chief Justice Key reveal a history of the title that may be summarized as follows:

The land in controversy is the portion lying on the north side of the Rio Grande River of four leagues granted by the government of Spain, in 1767, to the town of Reynosa as "Ejidos," or town commons; the town being upon the south side of the river and the "Ejidos" extending across it and lying in part upon its northern side. At a time not definitely shown but probably in the year 1801, on account of the danger from floods of the river, upon petition of its citizens the municipality of Reynosa was removed by the government to another place about six leagues away that became known as "New Reynosa."

On August 31, 1836, when the land was within the territorial boundaries and under the political jurisdiction of the Mexican State of Tamaulipas, the alcalde of New Reynosa addressed a letter to the Governor of Tamaulipas, recommending the sale of the "Ejidos" of Old Reynosa, stating, among other reasons therefor, that disputes had arisen among the owners of certain tracts adjacent thereto as to their respective boundaries; that upon the removal of the town the "Ejidos" had been abandoned and left to the exclusive use of the few who remained

living there, and could be easily sold to the owners of abutting porciones which had no river front on account of such location. The letter was referred to the departmental junta at the City of Victoria, which body recommended the sale by public auction to the highest bidder. On October 5, 1836, such sale was ordered by the Governor of Tamaulipas. Pursuant to his order the sale of the "Ejidos" was made, on November 9, 1836, at public auction by the alcalde to Fruto de Cardenas, the highest bidder, for $210, which was paid on the same day. In making the purchase Cardenas was acting for ninety-six inhabitants of Old Reynosa. On November 10, 1836, the alcalde who made the sale ordered that a deed of conveyance be made to the ninety-six purchasers. On July 24, 1837, the alcalde ordered the land surveyed before the issuance of title. After the survey, and payment of the surveyor's fees on September 23, 1841, a testimonio of title was issued on September 24, 1841, by the alcalde to the ninety-six purchasers for whom Cardenas had acted in bidding in and paying for the land. It is conceded that Gallardo and his associates hold title under this sale.

In the year 1871 Noberto Garza, holding a title under this sale and relying upon it, brought a suit against the State for confirmation of such title under the Act of August 15, 1870, in which judgment was rendered for the State and later affirmed by this court. 64 Texas, 670. This judgment was made the basis of a plea of res judicata urged by the State against the defendants' title.

While no occupancy of the land at the time of the sale of November 9, 1836, was established, the proof showed that many of the defendants, Gallardo and others, had been paying taxes each upon a specified number of acres of the land, ranging from 10 to 1500 acres, from 1879 to the time of the trial in 1909; that some of them, and their ancestors under whom they claimed, had been in possession of the land, some on the Texas side and others on the Mexican side of the river; for forty or fifty years; that for many years two or three villages had been upon the land composed largely of claimants under this sale and their families; and that there was a tradition in the locality that the ancestors of these defendants had, from the date of the sale, claimed and held possession of the land under it.

An official map of Hidalgo County, dated April, 1880, designates the land involved as "Los Ejidos de Reynosa," with delineation of the various porciones granted to individuals and adjacent to it; and also designating the old town of Reynosa immediately across the river on the Mexican side. Another official map of the county, dated April, 1896, contains substantially the same designations, with certain characters indicating that at some time certificates had been filed on the land. Both maps are on file in the General Land Office of the State.

The Court of Civil Appeals has further found that there was proof tending to show the Commissioner of the Land Office for 1903-1909 had treated the land as titled land; that in 1905 the defendants Brooks, Boswell, McDonald and Spaeth had each made application to purchase four sections of the land from the State, and that the county surveyor

of Hidalgo County had made surveys upon each application and re-
turned them to the Land Office, but the Commissioner had taken no
action on the claims asserted under these applications.

Other than its resistance through its Attorney General of the suit
filed against it by Noberto Garza in 1871, seeking confirmation of a
title to land asserted under the sale of November 9, 1836, the State
had never contested the validity of the title held under this sale until
the institution of the present suit in 1908.

As affecting the validity of the sale of November 9, 1836, under the
Mexican law, the Court of Civil Appeals has further found as a fact
that at that time the old town of Reynosa had been abandoned and the
municipality of that name removed and established at a different place,
which is supported by the proof; and that there was evidence affirm-
atively showing that the Mexican government had acquiesced in the
validity of the title under the sale as it is related to that part of the
"Ejidos" lying on the Mexican side of the Rio Grande River.

The land is a part of the territory lying between the Nueces and
Rio Grande Rivers, originally within the Mexican State of Tamaulipas,
over which the Congress of the Republic, as a consequence of the Revo-
lution, asserted its sovereignty by the Act of December 19, 1836, defin-
ing the Rio Grande as the southern boundary of the Republic; and with
respect to which the historic fact is that the jurisdiction of Texas was
not in fact established or exercised, except along and near the Nueces
River, until after its annexation to the United States in 1845, the
Mexican State of Tamaulipas continuing, during such period, to exer-
cise its jurisdiction over that part of the territory on and near the Rio
Grande, including this land.    State v. Sais, 47 Texas, 307.

The main proposition upon which the State rests its claim is that
the title to the land in fee was in the Mexican government, and the
land passed to Texas as a part of the public domain acquired by the
Revolution.    This position controverts both of the propositions upon
which the defendants Gallardo and others base their claim, viz:    (1)
That the effect of the Spanish grant of 1767 to the town of Reynosa
was to vest in its inhabitants such title or right to the "Ejidos" included
within it as to entitle the defendants, as their descendants and present
inhabitants of the town, as against the State, to a continuance of the
public use and benefit to which the "Ejidos" as town commons was orig-
inally dedicated under the grant.    Or, in other words, as descendants
and present inhabitants of Old Reynosa they have succeeded to the title
to the "Ejidos" held by the original inhabitants, which was a right to
their public use incapable of divestiture by either the Spanish crown or
Mexican government, and enforcible against Texas as the succeeding
sovereignty on the cession of the territory.    (2)    That under the sale
of November 9, 1836, the purchasers, under whom they claim and hold,
acquired title to the land before the sovereignty of Texas attached to
the territory, to which the courts should give effect.

Apart from other questions in relation to the character of title con-
ferred by the sale of November 9, 1836, the State urges the invalidity

of that sale under the Mexican law upon the ground, it is said, of the want of any authority in the Governor of Tamaulipas to order it in the absence of affirmative evidence of a previous approval by the supreme government. This contention is based upon provisions of the law of October 3, 1835, enacted or decreed by the Mexican assembly and certain regulations decreed by the President ad interim in its connection, particularly Regulation No. 13 to this effect:

"Until the attributes of the government and departmental boards in what relates to the Treasury, are declared by law (which was not done until April 17, 1857), said Governors shall make no sale of lands (fincas) or property (bienes) nor contracts nor extraordinary expenses for said departments, without the previous approval of the supreme government."

It is further said that the Governor of Tamaulipas was without authority to make the sale under the Treasury regulations of the Mexican government of July 20, 1831. It was this law of October 3, 1835, which reduced the Mexican States to the rank of departments, and transformed the Federal system into a centralized government, denounced as an act of usurpation in the Texas Declaration of Independence. At this period Santa Anna had and used the power of a dictator in Mexico. The Act of the Assembly continued the Governors of the different States in office, subject to the supreme government of the nation. Whatever may have been the effect of the Treasury regulations of 1831, if any force be given to the regulations decreed by the President ad interim under the law of October 3, 1835, as is urged should be done, it must be conceded, we think, that under Regulation No. 13, above quoted, the power of the Governors of the States to make sales of land was distinctly recognized, with only the limitation that until the attributes of the government and the departmental boards in relation to the Treasury were declared by law, the power should be exercised only upon the previous approval of the supreme government. In ordering the sale in question the Governor of Tamaulipas acted in his official capacity and under purported authority. His act was but the exercise of a power, not denied to him but recognized by the regulation quoted. The previous approval of the supreme government was necessary, it is true, to its exercise under the provisions of the regulation. But the question that here arises is, should it not be presumed after this long lapse of years, in the light of our knowledge of the conditions that then obtained in that country, that such previous approval of the sale by the supreme government was given? We think so, under established principles in relation to the acts of public officers in their official capacity under purported authority, as to which legitimate rather than usurped authority is presumed. United States v. Peralta, 19 How., 343, 15 L. Ed., 78; Strother v. Lucas, 12 Pet., 410, 9 L. Ed., 1137; Texas Mex. Ry. Co. v. Jarvis, 69 Texas, 541, 7 S. W., 210. It would seem from the terms of the law of the Assembly and the edict of the President ad interim that during this period that official was, himself, the supreme government of the nation; and, as is well observed in the

opinion of Chief Justice Key, it does not appear but that such approval was subject to be given in a purely informal manner. It is familiar knowledge that subsequent to the time in question, alcaldes, acting under the direction of the Governors, issued titles in various States of Mexico, and the validity of such titles has been recognized by that government; and, as we have before said, there was evidence in this case tending to show affirmatively that it had acquiesced in the validity of the title under this sale to that part of the land sold, lying on the southern side of the Rio Grande. The notorious claim under the title, the long continued possession of the land in virtue of it and the acquiescence in its validity by distinct governments for the period of time here shown, all combine to warrant the presumption that such approval by the Mexican authorities as was necessary to the validity of this sale, was given. In one of his opinions in regard to the presumption of the issuance of a grant, Lord Kenyon speaks of a case being such as to justify the presumption of one hundred grants, if necessary to sustain the right; and that observation might justly be applied here so far as the case involves the question of the approval of this sale by the Mexican government.

Two further propositions advanced by the State will be briefly discussed before passing to what we regard as the more important question in the case. One is that the judgment in Garza et al. v. State, by which the confirmation of a title to land resting upon this sale was denied, is conclusive of the validity of the title as to all land held under it, and binding upon these defendants. That suit was brought under an Act making special provision for suits of that nature. There is nothing in the Act that suggests that judgments rendered in such suits should affect the title of others than the parties to them and their privies, whose rights alone were put in issue; or that the effect of an adverse adjudication in respect to any certain title upon such proof as the particular plaintiff might offer, was to invalidate it as to all other persons claiming thereunder, though not before the court and therefore without opportunity to be heard. As illustrating the injustice of such a holding the claimants in the Garza case were denied a confirmation of their title because, as appears from the opinion, they failed to show any sale of the land prior to December 19, 1836, which, if shown together with payment of the purchase money, would have created a perfect title according to the opinion; whereas in this case the fact of the sale and such payment, both before December 19, 1836, was clearly established. It is sufficient to say that that judgment could have no effect upon the defendants here, between whom and the plaintiffs in that suit there is no privity.

The other proposition of the State is that the title of the defendants, if ever valid, was rendered null and void because the field notes to the land were not returned to the Land Office on or before August 31, 1853, as required by the Act of February 10, 1852, which provided: "That the field notes of all surveys made previous to the passage of this Act shall be made out and returned in the manner now required by law to the General Land Office on or before the 31st day of August, 1853, or

they shall become null and void, and the said surveys shall become vacant land, etc." We do not think this Act indicates any purpose of the Legislature to deal with titles issued by a former government, which upon just principles were entitled to be upheld by the courts of the State. It plainly has reference in our opinion to surveys made under authority of laws enacted by the Republic or the State. Had the purpose of the Act been to thus destroy titles issued under a former sovereignty and deserving of recognition under our own, it would have been written in broader terms, we think, than those having relation only to the field notes of surveys.

We do not subscribe to the view that the title of the defendants should be upheld under the Spanish grant to the town of Reynosa of the "Ejidos" in question. Under the Spanish law the title in fee to such lands granted to a town and dedicated to a public use, remained in the crown, never vesting in the municipality or its inhabitants. It may be difficult to state with precision the exact nature of the title conferred upon towns under such grants, as said in Townsend v. Greely, 5 Wall., 336, 18 L. Ed., 547; but it was clearly not an indefeasible title, and there was no ownership of the lands in the towns or their inhabitants. Idem. The most that can be said for the title of the towns or their inhabitants under such a grant of land for town commons is that they acquired such right as to withdraw the land from commerce and render it inalienable by the king so long as it remained dedicated to an essentially public use. Dittmar v. Dignowitty, 78 Texas, 22, 14 S. W., 268. Upon the question of the nature of the right or title acquired by towns or their inhabitants under the Spanish law to lands of this character, no more than this is affirmed in New Orleans v. United States, 10 Pet., 662, 9 L. Ed., 573, or in Lewis v. San Antonio, 7 Texas, 317, and San Antonio v. Lewis, 15 Texas, 388, which quote from the decision of United States v. New Orleans with approval; and no further right in the municipalities or their inhabitants to "Ejidos" or town commons under Spanish grants, as it existed under the Spanish sovereignty, can be grounded on the doctrine announced in those cases. It may be observed that the later decisions of the United States Supreme Court in United States v. Santa Fe, 165 U. S., 675, 17 Sup. Ct., 472, 41 L. Ed., 874, and United States v. Sandoval, 167 U. S., 278, 17 Sup. Ct., 868, 42 L. Ed., 168, announce a different rule as deduced from the Spanish law upon this question as related to outlying lands,—such as would seem to necessarily include town commons for pasturage,—to which it might be considered a town was entitled under its grant, from that declared in United States v. New Orleans. In these cases it is said that under the Spanish law the power of the crown to dispose of such lands was unlimited so long as they were not affected by individual rights, a statement from the opinions being to the effect that "the unquestioned power (was) lodged in the king of Spain to exercise unlimited authority over the lands assigned to a town and undisposed of and not the subject of private grant." The effect of these decisions is a plain denial of the proposition that under Spanish grants there is in

such towns or their inhabitants such character of title to such lands as, in the absence of confirmation by its political authority, may be successfully asserted against the succeeding sovereignty. The legislation by Congress and of this State, in various instances expressly confirming to such towns their ancient commons under these grants, in addition to this authority, indicates this conception of the nature of their title and that their possession of any other than such right as was at best imperfect, has never been recognized either by the United States or Texas. We are advised of no holding in this State to the contrary. In Lewis v. San Antonio it will be noted that by an Act of the Congress of the Republic, the City of San Antonio had been expressly confirmed in its commons held under the original grant, an act of the political authority which undeniably foreclosed any contention that thereafter they could constitute any part of the public domain of the State. There is nothing in the opinion of Judge Lipscomb in that case which supports the view that in the absence of confirmation the city or its inhabitants would have had an absolute title to the lands as against the State.

Under any view the control and regulation of the use of such lands was in the government; and it is clear, we think, that upon the abandonment of their public use they reverted to the sovereign. We have in this case a distinct finding of the Court of Civil Appeals, supported by the proof, to the effect that upon petition of its inhabitants the location or situs of the original town of Reynosa was abandoned, the town removed and established by the government at a different place. This necessarily terminated the public use of the lands and relieved them of their former character. The fact that a few of the inhabitants clung to the old site and remained behind could not have the effect to preserve the public use for their benefit.

The claim of the defendants, therefore, must necessarily rest upon such title as was acquired under the sale of November 9, 1836, authorized by the Governor of Tamaulipas. Upon this feature of the case we do not deem it necessary to reopen the question urged by the able counsel for the State as to whether property rights within the territory over which the sovereignty of Texas was extended, were within the protection of the treaty of Guadalupe Hidalgo. That in relation to such rights that treaty has the force of law in Texas, has been repeatedly affirmed by this court. State v. Sais, 47 Texas, 307; Clark v. Hills, 67 Texas, 141; Haynes v. State, 100 Texas, 426, 100 S. W., 912. We furthermore regard it as established in this State, under these decisions and others and in the light of the State's legislation, that a title to lands within the original Mexican State of Tamaulipas and the present boundaries of Texas that was good as against the Mexican government on December 19, 1836, the date of the Act of the Congress of the Republic defining the boundaries of Texas so as to include that territory, is within the protection of the treaty and entitled to recognition in the courts. The rights of the defendants should be determined, therefore, by the character of the title under which they claim as it existed on December 19, 1836.

A thorough consideration of this question in the case has convinced us that in a court of law and right whose duty it is to administer the justice of the law, no sound reason can be urged why a title shown to have been matured by acts of the sovereign government and conduct of parties in reliance upon such acts to the extent this title was on December 19, 1836, should not be protected and upheld. The application of the alcalde that the land be sold was made to the Governor on August 31, 1836. This application was referred by him to the departmental junta for their approval, the status of the State being then that of a department of the general government, and that body recommended the sale. Upon this recommendation it may be assumed the Governor ordered the sale on October 5, 1836. It was conducted in the manner ordered, and completed on November 9, 1836. The subject matter of the sale was a body of land having a distinct identity under the law and in fact, with a survey only necessary to define its exact boundaries. The purchase was made by those under whom the defendants claim acting through Cardenas, who bid in the land. The purchase money was paid on November 9, 1836, and on November 10, 1836, the alcalde making the sale ordered that a deed of conveyance be made to the purchasers. Everything necessary to make up and complete the right of the purchasers to receive the absolute legal title was done both by them and the government through its officials prior to December 19, 1836, and upon that date nothing was left undone by either that could constitute the substance of the right.

On December 19, 1836, the purchasers under this sale stood invested with a clear right to receive from the sovereign government the legal title to the land, not as a matter of grace but of right, unless it be denied that individuals in the purchase of public domain from a government in the manner both authorized and pursued by it in the transaction can acquire any rights against it until its conveyance of the title, a proposition to which no court would give tolerance much less its sanction. Unless importance be attached to the fact that no survey of the land had been made prior to December 19, 1836, what possible element was wanting to perfect the right of the purchasers under this sale to receive the full legal title? As has been said, the land had its distinct identity under the Mexican law and in fact. Its location, its quantity as four leagues, and its general extent were known and recognized, and it was capable of having its exact boundaries defined, as was thereafter done. The direction for a survey in the order of the alcalde of November 10, 1836, wherein the conveyance was ordered to be made, plainly deals with the survey only as an incident of the sale rather than as in any manner affecting the right of the purchasers to the land, or to receive the deed of conveyance. The same is true in respect to his direction that the names of the purchasers be furnished. In Fremont v. United States, 17 Howard, 542, 15 L. Ed., 241, where a grant of a Mexican Governor of California was simply of ten square leagues of land within a certain district, the same objection was urged that the

grantee acquired no vested interest until the land was surveyed and the part to be granted severed by lines or known boundaries from the public domain; but it was held that as between the grantee and the government he had a vested interest in the quantity of land mentioned in the grant, and that the *right* to so much land, to be afterwards laid off by official authority in the territory described, passed from the government to him under the instrument. The description in this order is more definite than the description in that grant. The order directs the conveyance of "the four leagues which served as 'Ejidos' to Old Reynosa," identifying the land by location as well as defining its quantity. If a grant in such terms would have passed a vested interest in the land, as against the government, notwithstanding there had been no survey, the right of these purchasers to receive the legal title from the government was not affected by the mere lack of a survey. In other words, the survey was not a condition precedent to the maturing of their right to the land. It was something to be done before the legal title passed, but it was not a condition to be performed before the vesting of the *right* to receive the legal title. Such right was matured by the purchase and the payment of the purchase money. That in virtue of such acts these purchasers were, on November 10, 1836, entitled to receive a deed of conveyance is evidenced and confirmed by the alcalde's order of that date that the deed be made. There is nothing in the order indicating anything less than a plain recognition of their right to receive the legal title, or, in respect to the survey and the listing of the names of the purchasers, anything more than a provision for the execution of a proper and sufficient deed for the conveyance of such title.

Following these acts in relation to this sale, as has been previously stated, on July 24, 1837, the alcalde ordered the land surveyed before the issuance of the title. Whatever construction be placed upon this order it could have no bearing in the case, since, prior to that time, the Republic had asserted its sovereignty over the territory by the Act of Congress of December 19, 1836. One of the contentions of the State is that the sovereignty of Texas over this territory attached at even an earlier date. To affirm the sovereignty of Texas over this territory on July 24, 1837, is, of course, to deny any effect to the order of that date of a Mexican official in relation to land within it, as the order could be of no force in respect to the title to land then under the sovereignty of Texas. However, the survey was made, the fees of the surveyor were paid on September 23, 1841, and a testimonio of title was issued to the purchasers on September 24, 1841, during which time the territory was in the actual possession of the Mexican government and under the administration of its political authority, the sovereignty of Texas over it not being accomplished in fact until the year 1846. There is presented, in other words, a case where, prior to the assertion by Texas of its sovereignty, there was such perfection of the right as entitled those under whom the defendants claim to the legal title to the land, and where, prior to the accomplishment of its sovereignty in fact, the legal title was actually acquired.

It may be well doubted whether this title, as it stood on December 19, 1836, should be regarded as imperfect, even under a rigorous application of the rule that such titles are without standing in the courts of the succeeding sovereignty and must depend upon its political authority for recognition. It is clearly such a title as the Mexican government was in right bound to recognize, and as ought to have secured the full legal title at its hands but for the interruption of its sovereignty as the result of the Act of the Texas Congress of December 19, 1836, and such as did in fact secure the full legal title from its accredited authorities before its sovereignty was actually supplanted; and unless it be true that under the rule referred to any title, however perfect in right and good in conscience, is imperfect and not entitled to judicial cognizance unless it be a full legal title, which may be questioned, we think a court would be slow in the use of its power to destroy a title of this character under the supposed sanction of such rule of decision.

But if in the strictest sense it be treated as an imperfect and unconfirmed title, is not the question presented here under such conditions as lay within the prophetic vision of Chief Justice Hemphill when in the 1st Texas, discussing the rule for which the State contends, he said:

"It is not necessary in this case to express any opinion as to the equities which may arise from long possession under incomplete titles, or where the boundaries are sufficiently defined by description or survey, etc., and how far, and under and against what claims it might be in the power of the courts of justice to afford any protection where action has not been taken by the political authority. Such questions can be determined when distinctly presented for review and decision." Trimble v. Smithers, Admr., 1 Texas, 809.

The court was confronted with the question in Haynes v. State, 100 Texas, 426, 100 S. W., 912, and determined it as we think it ought to be determined here. There, citizens of this same Mexican State had, prior to December 19, 1836, done all that was necessary to acquire the right to have the legal title issued to them, but it had not been issued at that date, as is here the case. The legal title was issued in 1848, when Tamaulipas had lost actual sovereignty over the lands, whereas here it was issued while the actual jurisdiction of Tamaulipas endured. The same element of long possession under the claim of right was presented. In the suit by the State for the land it was held:

"If, therefore, the evidence introduced upon the trial shows that Antonio Zapata was, on the 19th day of December, 1836, entitled to have a grant issued, the State ought not to recover the land in controversy, because such title would be protected by the treaty of Guadalupe Hidalgo. It is true that the Attorney General insists that the facts do not establish such a title as would be embraced in the terms and protection of that treaty, but we are of opinion that the position is not well taken. . . . The facts of this case established that Zapata, under whom the plaintiff in error claims, had, on the 19th day of December, 1836, done all that the law required of him, and was entitled under the laws of Tamaulipas to receive from the Governor of that State a

grant for the five leagues of land. It follows from this conclusion that we must reverse the judgments of the District Court and of the Court of Civil Appeals."

There is no substantial difference between the two cases. The title there considered, resting upon a right acquired before the date of the assertion of Texas sovereignty over the territory, had received no confirmation from the political authority of the State and, under such application as the State here contends should be made of the doctrine we have above referred to, could have had no better standing in the courts than the title involved in this case. This is in one respect the stronger title, as here the payment of the purchase money for the land was clearly established; whereas in that case such payment was not shown but it was held should be presumed. That title was less than a full legal title .on December 19, 1836, as is true in respect to this title on that date, though resting as does this title upon a perfected right to the legal title. Upon the same considerations that are present in this case, the considerations of good conscience, right and simple justice and a faithful observance of the obligations proceeding from a solemn treaty, this court held plainly and directly that such a title should not be destroyed by the courts but should be given effect. The ruling there announced can not be regarded as other than conclusive of the vital question in this case.

We have given the case the careful consideration that we have felt it deserved. We are convinced that the judgment of the Court of Civil Appeals should be affirmed, and it is so ordered.

*Affirmed.*

Mr. Justice Hawkins did not participate in this decision.